Larry J. SPROSTY, Petitioner–Appellee,

v.

Dan BUCHLER, Acting Warden, Racine Correctional Institution, and James E. Doyle, Attorney General of the State of Wisconsin, Respondents–Appellants.

No. 95–1688.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1995.

Decided March 26, 1996.

Thomas H. Strakeljahn (argued), Lancaster, WI, for Petitioner-Appellee.

Thomas J. Balistreri (argued), Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, WI, for Respondents-Appellants.

Before POSNER, Chief Judge, and LAY * and ROVNER, Circuit Judges.

* The Hon. Donald P. Lay, of the Eighth Circuit, sitting by designation.

ILANA DIAMOND ROVNER, Circuit Judge.

Following the denial of a motion to suppress his confession and other incriminating statements he made to police, Larry J. Sprosty pleaded no contest to two counts of first degree sexual assault, two counts of sexual exploitation of a child, and one count of child enticement. Sprosty was sentenced to five years in prison on each count, the terms to run concurrently. The Court of Appeals of Wisconsin affirmed his conviction in an unpublished opinion, and the Supreme Court of Wisconsin denied review. Sprosty then petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court granted Sprosty's petition on the ground that, after placing him under custodial arrest, the police ignored Sprosty's request for an attorney and persisted in interrogating him in violation of his rights under *Miranda v. Arizona* and *Edwards v. Arizona.* At the close of a series of suppression hearings, however, the state trial court found that Sprosty had not requested that an attorney be present during the questioning. Having determined that the state court's finding is fairly supported by the record and is thus entitled to a presumption of correctness under 28 U.S.C. § 2254(d), and that no other violation of Sprosty's constitutional rights took place, we reverse the judgment below with directions to dismiss the petition.

## I. BACKGROUND

Sprosty's convictions stem from a series of incidents that took place in November and December 1989, when Sprosty performed sexual acts with two adolescent boys and took pornographic pictures of them. Both of the boys were heavily under the influence of alcohol at the time and may not have been fully conscious. During the late afternoon of January 12, 1990, Lauren Knutson, Roger Lund and Bill Fillback of the Crawford County Sheriff's Department in Wisconsin, Jerry Valley, of the Allamakee County Sheriff's Department in Iowa, and Conservation Warden Dennis Kirschbaum converged upon Sprosty's mobile home in order to execute a search warrant for pornographic pictures and stolen items. When the officers reached the mobile home, they found Sprosty seated in a car in the driveway. Two squad cars pulled into a driveway next to and in front of Sprosty's car, and Chief Deputy Lund's squad car blocked the path from Sprosty's driveway to the street. Deputy Knutson read the search warrant to Sprosty and accompanied Sprosty into the kitchen of the mobile home, where he again read the warrant to Sprosty and informed him of his *Miranda* rights. Sprosty signed a statement that he had been advised of his rights and understood them. Lund, Sprosty's mother, June Sprosty, and a friend who resided with them, Renee Ingle, were also present. Lund, who was armed and in uniform, remained in the mobile home to keep watch over Sprosty while the other officers searched inside and outside the mobile home. Lund did not assist in the search itself. During the nearly three-hour search and prior to the discovery of the pornographic photographs, Sprosty only left Lund's presence when he accompanied two other officers to a bedroom in the mobile home. (Mar. 1, 1990 Tr. at 46.)

A short time after the police arrived, June Sprosty tried to telephone her attorney, Mark Peterson. Prior to making the call, June testified that she asked Lund whether she could call her attorney, and that Lund had told her to "hang up the phone, shut up and sit down." (Mar. 1, 1990 Tr. at 56.) June also testified that she telephoned Peterson's home only to discover that he was out for the evening. She further testified that Sprosty then asked her to call his lawyer, Thomas Strakeljahn, and that Lund commented that Sprosty did not need a lawyer. (Mar. 1, 1990 Tr. at 56–57.) Her testimony was, however, equivocal as to whether Sprosty made a direct request to Lund to be allowed to call his attorney, or whether Lund merely overheard Sprosty ask his mother to make the call and then tried to dissuade her from doing so. (Mar. 1, 1990 Tr. at 56.) By contrast, Renee Ingle testified that when June asked Lund whether she could call her lawyer, Lund said that she could, but that it would not be necessary. (Mar. 1, 1990 Tr. at 80.) Ingle further testified that Mark Peterson was the only attorney mentioned by name, and that Sprosty asked his mother to call his lawyer, but that Lund then com-

mented that calling a lawyer would be futile in the face of all of the evidence they had against Sprosty. (Mar. 1, 1990 Tr. at 81–82.) When asked on cross-examination whether Sprosty had requested to telephone attorney Strakeljahn, Lund testified, "Oh boy, I can't say that he did or he didn't. I don't remember. The only thing I remember is when June wanted to call an attorney." (Mar. 1, 1990 Tr. at 51.) Neither Lund nor Ingle were directly asked whether Sprosty had stated to Lund (as opposed to his mother) that he wanted a lawyer present. (Mar. 1, 1990 Tr. at 49–51, 81–82.)

During the search, several of the officers repeatedly asked Sprosty where the pornographic pictures were hidden. Deputy Sheriff Jerry Valley testified that he had promised Sprosty that if Sprosty cooperated, burglary charges against him in Minnesota would be dropped. (Mar. 1, 1990 Tr. at 42.) The record is unclear as to whether the officers searched the bedroom of Sprosty's late father before or after Valley made the promise. June Sprosty testified that, upon seeing Knutson remove a pair of slacks from her late husband's closet, she began to cry, and that Sprosty then told her, "Mom, I will tell them the truth, I will give them what they are looking for." (Mar. 1, 1990 Tr. at 58.) In either case, approximately twenty minutes after Valley made the promise to have the burglary charges dropped, Sprosty led him to a pick-up truck adjacent to the mobile home and removed several pornographic photographs from the pocket of a leather jacket hidden in the truck. Sprosty then handed the photographs to Valley. (Mar. 1, 1990 Tr. at 30–32, 42.) Sprosty was transported to the Sheriff's Department, where he was again advised of his *Miranda* rights. After two hours of questioning, he signed a statement confessing to the crimes. At a subsequent hearing, the state trial court determined that James A. Fabian, the county prosecutor of Houston County, Minnesota, had agreed not to pursue possible burglary charges against Sprosty in Minnesota, and to allow Wisconsin authorities to communicate that information to Sprosty if it would aid them in their investigation of the present offenses. (Feb. 7, 1991 Tr. at 35–36, 38–39.)

Prior to trial, Sprosty moved to suppress his confession and other incriminating statements, as well as the photographs seized in connection with those statements. He argued that this evidence was obtained in violation of his right under *Miranda* and *Edwards* to have custodial interrogation cease as soon as he requested a lawyer. In a separate motion, Sprosty asserted that his confession was coerced by Valley's empty promise that the burglary charges in Minnesota would be dropped if he cooperated. The state trial court held evidentiary hearings on March 1, 1990 and February 7, 1991 to consider Sprosty's motions. At the close of the first hearing, the judge denied the motion based on *Miranda* and *Edwards* for the following reasons:

> If the testimony was that Mr. Sprosty told one of the officers that he wanted to talk to an attorney, the rule is that you don't ask him any more questions, you just let him talk to his attorney and that is it, period. But that information has to be relayed either directly or indirectly. [ ... ] There is a provision in the statute that when an officer prohibits a person from talking to an attorney after the person has requested to talk to an attorney, there is a penalty for that. I recognize that provision of the statute. But that isn't the case here. Mr. Sprosty will have to show that either these officers were made aware of the fact that he wanted to talk to an attorney and that he was denied that right and then continued to be questioned. There are inconsistencies as remembered by the officers on the scene and as remembered by the ladies on the scene. And even between the ladies and the officers, there is a difference in some respects. I can understand what happened. I can understand why Ms. Sprosty [Sprosty's mother] would be upset, she had been sick for two or three days and I can understand why Ms. Ingle might be upset, never having experienced that before. But as far as the officers violating the *Edward's* rule pertaining to questioning after being told that he wanted to talk to his attorney, I don't have any evidence to show that.

(Mar. 1, 1990 Tr. at 87–89.)

At the close of the second evidentiary hearing, the judge refused to suppress the

evidence obtained as a result of Valley's promise to have burglary charges against Sprosty dropped, finding that the promise did not taint this evidence because Valley had a basis for making the promise, and the promise was indeed fulfilled. (Feb. 7, 1991 Tr. at 35–39.) The judge also revisited the issue of Sprosty's alleged request for an attorney, stating that,

> [t]here was enough conflict between your witnesses and the State's witnesses as to whether or not there was a request for an attorney at the time you told your mother to call your attorney, that it just seems to me the issue of whether that in fact actually took place was so unclear that I believe the officers' recitation. If I didn't say it before, I do now, I believe their recitation was beyond a reasonable doubt.

(Feb. 7, 1991 Tr. at 38.) Sprosty subsequently entered a no contest plea and was sentenced to five years in prison, reserving the right to challenge the suppression rulings on appeal. The Court of Appeals of Wisconsin affirmed, and the Supreme Court of Wisconsin denied review.

Sprosty then filed the present petition for a writ of habeas corpus in federal district court, alleging the same violations of his constitutional rights. Restricting its analysis to the *Miranda–Edwards* claim, the district court concluded that Sprosty was subjected to custodial interrogation within the meaning of *Miranda*, that the trial court's finding that Sprosty had not requested an attorney was not fairly supported by the record, and that the state appellate court had based its affirmance of Sprosty's conviction on a mistake of law. The court then granted the petition without reaching the alternative argument that Sprosty's confession had been coerced by an empty prosecutorial promise. *Sprosty v. Buchler*, No. 93–C–1175 (E.D.Wis. Feb. 28, 1995) (unpublished).

## II. DISCUSSION

■ As a threshold matter, the state argues that during the execution of the search warrant, Sprosty was not in the type of coercive custody contemplated by *Mi-*

*randa*, and that the safeguards imposed by *Miranda* and *Edwards* in the context of custodial interrogations are therefore inapplicable. The state maintains that it is thus irrelevant whether Sprosty requested an attorney before the officers asked him to produce the pornographic photographs that were the subject of their search. The issue of whether Sprosty was in custody at the time of his interrogation is "a mixed question of law and fact" subject to our independent review.[1] *Thompson v. Keohane*, — U.S. —, —, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995).

■ In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). An interrogation is custodial if it occurs while the person "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* As the Court further explained in *California v. Beheler*, whether a person is in custody depends on the totality of the circumstances, the ultimate inquiry being "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam*) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (*per curiam*)); *see also United States v. Betts*, 16 F.3d 748, 761–62 (7th Cir.1994); *United States v. Kelly*, 991 F.2d 1308, 1312 (7th Cir.1993). Whether Sprosty was in custody during the execution of the search warrant thus turns on the degree to which his freedom of action was curtailed by the police.

■ Our examination of the totality of the circumstances surrounding Sprosty's interrogation must be informed by the underlying purpose of the *Miranda* rule, namely, to protect individuals from compelled self-incrimination. *See Berkemer v. McCarty*, 468

---

**1.** The state concedes that Sprosty was subjected to interrogation under *Miranda*.

U.S. 420, 433, 437, 104 S.Ct. 3138, 3146–47, 3148–49, 82 L.Ed.2d 317 (1984). We must therefore consider whether Sprosty was subjected to "pressures that sufficiently impair[ed] his free exercise of his privilege against self-incrimination," *id.* at 437, 104 S.Ct. at 3149, to require that the procedural protection of *Miranda* and *Edwards* be applied here. *Id.* Although the Supreme Court has never provided an exhaustive list of factors to be considered in determining whether a suspect is in custody within the meaning of *Miranda*, its reasoning in *Berkemer* is highly instructive. In *Berkemer*, the Court held that, because of the "comparatively nonthreatening character" of the ordinary traffic stop, a detained motorist need not receive *Miranda* warnings before police may ask him a moderate number of questions. *Id.* at 439–40, 104 S.Ct. at 3149–50. Among the factors that make it unlikely that a person detained for a traffic stop will be coerced into " 'speak[ing] where he would not otherwise do so freely,' " *id.* at 437, 104 S.Ct. at 3149 (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624), are the brevity of the detention, the fact that it usually takes place in public view rather than in a police-dominated atmosphere, and that it involves the participation of only one or two police officers. *Id.* at 437–39, 104 S.Ct. at 3148–50. Circumstances such as these strongly mitigate the danger that a person's will to remain silent may be overborne by police coercion. *Id.*

■ With the Court's analysis in *Berkemer* as a guide, other courts have identified the following factors to be significant in determining whether a person is in custody: whether and to what extent the person has been made aware that he is free to refrain from answering questions, *see Betts*, 16 F.3d at 762; *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 2630, 132 L.Ed.2d 870 (1995); whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination, *see United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996); *Griffin*, 7 F.3d at 1518; the degree of police control over the environ-

ment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed, *see United States v. Smith*, 3 F.3d 1088, 1097–98 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994); *Johnson*, 64 F.3d at 1126; *United States v. Masse*, 816 F.2d 805, 809 (1st Cir.1987); and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene, *see United States v. Jones*, 21 F.3d 165, 170 (7th Cir.1994); *United States v. Fazio*, 914 F.2d 950, 955–56 (7th Cir.1990); *United States v. Hocking*, 860 F.2d 769, 773 (7th Cir.1988).

The proper characterization of Sprosty's detention for purposes of *Miranda* presents a close question. On the one hand, Sprosty was being held in familiar surroundings, in the presence of his mother and at least one family friend. He was not handcuffed or otherwise physically restrained to his chair. Although the trial court did find that Lund strongly discouraged June Sprosty from taking incoming telephone calls or telling a friend who had called that her mobile home was being searched, the court also concluded that Lund did not prevent her from telephoning her own attorney. (Mar. 1, 1990 Tr. at 88.) We may thus infer that Sprosty's ability to communicate with the outside world was also curtailed to some degree, but there is no evidence to show that Sprosty was isolated from his mother or prohibited from communicating with those present in the mobile home.

On the other hand, the familiarity of the surroundings in which a detention takes place is not alone dispositive; indeed, the Supreme Court has held that a suspect interrogated in his own bedroom in a boarding-house that had other occupants was in custody under *Miranda*, *see Orozco v. Texas*, 394 U.S. 324, 325–26, 89 S.Ct. 1095, 1096–97, 22 L.Ed.2d 311 (1969), but that a suspect who voluntarily came to a police station was not, *see Mathiason*, 429 U.S. at 494–95, 97 S.Ct. at 713–14. More important than the familiarity of the surroundings where Sprosty was being held is the degree to which the police dominated the scene. *See Griffin*, 7 F.3d at

1518–19 ("Where police are in full control of the questioning environment, custody is more easily found."). When the police arrived at the mobile home, they surrounded Sprosty's car, blocked the driveway from his car to the street, and escorted him inside. Four of the officers searched for the photographs while Lund, who was armed and in uniform, remained with Sprosty to guard him. Although a purely subjective intent on Lund's part not to allow Sprosty to leave the presence of an officer is not relevant for purposes of determining whether Sprosty was in custody, *see Stansbury v. California*, —— U.S. ——, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (*per curiam*); *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151–52, as the search progressed, it became increasingly apparent that Lund's role at the mobile home was to guard Sprosty, not to execute the search warrant. Moreover, during the nearly three-hour period that the officers searched the home, they repeatedly asked Sprosty to tell them where the incriminating photographs were located, and Valley offered him a deal if he would cooperate by disclosing the location of the photographs.

 Although the district court recognized that giving *Miranda* warnings to a suspect does not convert an otherwise non-custodial detention into a custodial arrest under *Miranda*, the court did express concern that in light of the totality of the circumstances facing Sprosty, the formal administration of the *Miranda* warnings by the police would have led a reasonable person in Sprosty's position to believe that he was under arrest. *Sprosty*, No. 93–C–1175, slip op. at 8–10 & n.1. The fact that upon their arrival, the police administered *Miranda* warnings to Sprosty certainly does not serve to establish that Sprosty was in their custody. *See* 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.6, p.499 (1984) (fact that police show solicitude for a suspect who is not under custodial arrest by advising him of his *Miranda* rights does not lead to paradoxical conclusion that the suspect actually is in custody); *see also Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir.1985) (to hold that giving *Miranda* warnings creates custody would "convert admirable precautionary measures ... into an investigatory obstruction"). As the district judge also noted, to hold that by Mirandizing a suspect the police may create a custodial setting where one would not otherwise exist would result in discouraging the desirable practice of giving *Miranda* warnings at the earliest point where a police-citizen encounter progresses beyond an investigatory stop. *Cf. Berkemer*, 468 U.S. at 430–32, 437–40, 104 S.Ct. at 3145–46, 3148–50 (bright-line rule that *Miranda* warnings be given as soon as suspect is in custody). Yet in the context of a prolonged detention where there is persistent, accusatory questioning by several officers, the fact that the police observed certain formalities of a custodial arrest without actually telling Sprosty that he was not under arrest does provide some support for an inference that Sprosty was in custody for purposes of *Miranda*. *Cf. Jones*, 21 F.3d at 170 (where suspect, who was questioned at police headquarters, was told he was not under arrest and was free to leave, interview was noncustodial); *Fazio*, 914 F.2d at 956 (where suspect was repeatedly told he was not under arrest and could leave at any time, he was not in custody).

In arguing that Sprosty's interrogation did not occur in a custodial setting, the state relies on this court's recent holding in *United States v. Burns*, 37 F.3d 276 (7th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 2592, 132 L.Ed.2d 840 (1995), that the brief detention of a suspect during the execution of a search warrant does not, without more, generally amount to "custody" for purposes of *Miranda*. *Id.* at 281; *accord, United States v. Saadeh*, 61 F.3d 510, 519–20 (7th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 521, 133 L.Ed.2d 428 (1995). The state further contends that there were no special circumstances distinguishing Sprosty's detention from the usual case where police require a suspect to remain on the premises while they execute a valid search warrant. As we explained above, however, Sprosty's detention involved significantly more than merely requiring him to remain at home during the search. Sprosty's detention was substantially more restrictive than that of either Saadeh or Burns. For example, in *Burns*, two officers executing a search warrant in the sus-

pect's hotel room instructed her to remain seated for three or four minutes while they searched the room for cocaine, and asked her a number of routine questions, such as who she was, why she was in Milwaukee, and who she knew in town. 37 F.3d at 277–78. The suspect in *Saadeh* was one of several persons present at an auto repair shop where a drug deal had taken place. 61 F.3d at 514–15. During a consent search of the shop, the suspect was briefly detained, and was asked if a toolbox—which later proved to contain drug money—belonged to him. *Id.* at 515, 520. Unlike Sprosty, Saadeh conceded that he was not treated differently than any of the other persons who happened to be at the repair shop when the police arrived, and that he was not the exclusive target of their accusatory questioning. *Id.* at 520. By contrast, the way in which the officers initially approached Sprosty, barring his path from the mobile home and escorting him inside, the fact that one armed officer was exclusively occupied with guarding Sprosty for nearly three hours while four other officers searched, and the persistent requests by the officers that Sprosty lead them to the incriminating evidence are all factors which distinguish this case from *Burns* and *Saadeh*. When viewed in their totality, these facts demonstrate that Sprosty's freedom of action was significantly restrained in a way that increased the likelihood that Sprosty would succumb to police pressure to incriminate himself. *See Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624; *Berkemer*, 468 U.S. at 437, 104 S.Ct. at 3148–49. We therefore agree with the district judge that Sprosty was in custody at the time of his interrogation by police, and that he was entitled to invoke the procedural protection of *Miranda* and *Edwards*.

■ Having determined that Sprosty was in custody under *Miranda*, the district court then concluded that the trial court's finding that Sprosty had not requested an attorney was not "fairly supported by the record," see 28 U.S.C. § 2254(d). The district judge held that the officers had violated Sprosty's rights under *Edwards* by continuing to interrogate him after he asked to call his lawyer, *see Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378

(1981), and accordingly granted Sprosty's petition.

■ Under section 2254(d), the statute governing federal habeas corpus proceedings, a state court's finding on a factual issue made after a hearing on the merits is presumed to be correct unless the federal court concludes that the finding is not fairly supported by the record. 28 U.S.C. § 2254(d)(8); *see Thompson*, ─── U.S. at ─── & n. 6, 116 S.Ct. at 463 & n. 6; *Armstrong v. Young*, 34 F.3d 421, 426 (7th Cir. 1994), *cert. denied*, ─── U.S. ───, 115 S.Ct. 1369, 131 L.Ed.2d 224 (1995). A factual issue is one that involves "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Thompson*, ─── U.S. at ───, 116 S.Ct. at 464 (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963)) (internal quotation, citation omitted). Moreover, the presumption that a state court's factual determinations are correct "applies not only to the state court's factual findings, but also to the implicit resolution of a factual dispute that can be fairly inferred from the state court record." *Armstrong*, 34 F.3d at 426. The resolution of a factual issue that involves the state trial court's evaluation of the credibility and demeanor of witnesses is one that is accorded particular deference. *See Thompson*, ─── U.S. at ─── ─ ───, 116 S.Ct. at 464–65; *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

The transcript of the March 1, 1990 suppression hearing in state trial court reveals that the judge specifically considered the testimony bearing on whether Sprosty had requested to speak with his attorney at some point during the interrogation. The judge recognized that if Sprosty had asked to speak with a lawyer, the police were required to stop questioning him, but he further noted that this "information has to be relayed either directly or indirectly." (Mar. 1, 1990 Tr. at 87.) After determining that neither Sprosty nor his mother had been prevented from telephoning their attorneys, the judge again turned to the question of whether Sprosty had asked to speak with his lawyer, stating "Mr. Sprosty will have to show that

... these officers were made aware of the fact that he wanted to talk to his attorney and that he was denied that right and continued to be questioned," (Mar. 1, 1990 Tr. at 89.), thus implying that Sprosty had failed to make that showing. *See Armstrong,* 34 F.3d at 426.

In explaining his view of the testimony, the judge noted that there had been certain inconsistencies in the testimony of the officers as well as in that of the defense witnesses, June Sprosty and Renee Ingle. The judge did not, however, specify what those inconsistencies were. Yet in commenting on the demeanor of the two defense witnesses, the judge stated, "I can understand what happened. I can understand why Ms. Sprosty would be upset, she had been sick for two or three days and I can understand why Ms. Ingle might be upset, never having experienced that before." (Mar. 1, 1990 Tr. at 89.) The judge then concluded that he had no evidence to show that Sprosty had asked to speak with his attorney. (Mar. 1, 1990 Tr. at 89.) At the February 7, 1991 suppression hearing, when the judge again turned to Sprosty's claim that he had requested an attorney, the judge stated, "it just seems to me the issue of whether that in fact actually took place was so unclear that I believe the officers' recitation." (Feb. 7, 1991 Tr. at 38.) The judge then denied Sprosty's motion to suppress his confession and the evidence police obtained as a result of his incriminating statements.

In the context of the factual issue at hand, the trial judge's remarks concerning the demeanor of June Sprosty and Renee Ingle, his statement that he had "no evidence" to show that Sprosty had requested an attorney, and his denial of Sprosty's suppression motion lead to the obvious inference that the judge discredited the testimony of June Sprosty and Renee Ingle. *See Armstrong,* 34 F.3d at 426. Sprosty points out, however, that at the February 7, 1991 suppression hearing, rather than specifically addressing the veracity of the two defense witnesses' testimony that Sprosty had requested counsel, the judge simply credited the officers' testimony. On the surface, the judge's statement that he believed the officers' recitation is problemat-

ic. The only officer who was with Sprosty at the time the alleged request was made was Lund, and Lund did not remember whether Sprosty had asked his mother to call attorney Strakeljahn. Lund's only recollection was that June Sprosty had sought to telephone her own attorney, Mark Peterson. Two other officers, who were searching for evidence and spent little time with Sprosty, simply testified that they did not hear Sprosty request an attorney, but they acknowledged that they were not present in the kitchen when Sprosty's witnesses say he made the request. Yet the judge's remarks at the close of the first suppression hearing, where the sole issue addressed was whether Sprosty had made the request, are by themselves sufficient to allow us to conclude that the judge had discredited the testimony of June Sprosty and Ingle on that issue. Thus, the trial judge's comments at the close of the second hearing, when read in conjunction with his statement at the first hearing, simply reaffirmed his belief that Sprosty had not asked to speak with a lawyer.

Relying on *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), the district court reasoned that because the testimony of June Sprosty and Renee Ingle that Sprosty had requested a lawyer was, from a logical standpoint, uncontradicted by the officers' testimony, the state trial court's implicit rejection of their testimony was not fairly supported by the record. In *Haynes,* the Supreme Court held that the introduction into evidence of Haynes' coerced confession at his trial for armed robbery violated his right to due process. *Id.* at 515, 83 S.Ct. at 1344. The Court first observed that, under the procedure in effect in the Washington courts at the time, the voluntariness of a confession was treated as a question of fact for the jury to determine. *Id.* at 506–07, 83 S.Ct. at 1339–40. In Haynes' case, however, the jury returned a general verdict of guilty without addressing the issue. *Id.* at 507, 83 S.Ct. at 1339–40. In light of the other evidence presented, it was impossible for the Court to determine whether the jury had implicitly rejected Haynes' testimony concerning the police coercion, or whether the jury had simply discounted the coerced confession and found that the remaining evi-

dence against Haynes was sufficient to support its verdict. *Id.* at 507–08, 83 S.Ct. at 1339–40. Thus, for the purpose of resolving the ultimate issue of the voluntariness of Haynes' confession, the Court conducted its own review of the evidence presented at trial and accepted as true the uncontradicted testimony of the defendant. *Id.* at 508–10, 515, 83 S.Ct. at 1340–41, 1344. Yet it is important to note that, unlike the testimony of Sprosty's witnesses, Haynes' testimony had never been specifically discredited by the trier of fact. *Id.* at 507, 83 S.Ct. at 1339–40. The trial court in our case was entitled to disbelieve Sprosty's witnesses without regard to whether the officers had contradicted their testimony, or were simply unable to remember whether Sprosty had requested counsel. Moreover, *Haynes* came to the Supreme Court on direct, not collateral, review. As we have discussed above, a federal district court is bound by the factual findings of the state court, particularly findings that are based on credibility determinations. 28 U.S.C. § 2254(d).

Indeed, even apart from the fact that particular deference is due to a trial judge's credibility determinations, in this case the court's decision to discredit the testimony of June Sprosty and Renee Ingle finds ample support in the bare transcript itself, as there were a number of inconsistencies in their testimony. For example, June Sprosty testified that Lund was exceedingly rude to her when she sought to telephone her lawyer and that Lund threatened to shoot her son in the back if he ran, yet she also testified that Lund was polite to her. (Mar. 1, 1990 Tr. at 5657, 60–61.) Ingle contradicted June when she testified that Lund never tried to prevent June from telephoning her lawyer, and that June received no answer when she did call. (Mar. 1, 1990 Tr. at 79–80.) Ingle also testified that June's lawyer, Mark Peterson, was the only attorney who was mentioned by name (Mar. 1, 1990 Tr. at 82), but June insisted that her son's attorney Thomas Strakeljahn was mentioned as well. (Mar. 1, 1990 Tr. at 56.) In view of these contradictions, we see no reason to question the judge's decision to reject the testimony of these two witnesses that Sprosty had requested an attorney.

 Finally, Sprosty asserts that his confession should have been suppressed on the ground that it was coerced by an empty prosecutorial promise, in violation of his right to due process of law under the Fourteenth Amendment. Although Sprosty raised this claim below, the district court did not address it, stating that it did not need to do so in light of its decision to grant Sprosty's petition on the ground of his *Miranda–Edwards* claim. An order granting a petition for a writ of habeas corpus is ordinarily considered a final judgment, even if the district court does not address all of the petitioner's claims. *Phifer v. Warden,* 53 F.3d 859, 862–63 (7th Cir.1995); *Blazak v. Ricketts,* 971 F.2d 1408, 1410–12 (9th Cir.1992) (*per curiam*) (collecting cases), *cert. denied,* —— U.S. ——, 114 S.Ct. 1866, 128 L.Ed.2d 487 (1994); *cf. Stewart v. Peters,* 958 F.2d 1379, 1388 (7th Cir.) (the better practice is for the district judge to decide all claims raised in petition), *cert. denied,* 506 U.S. 883, 113 S.Ct. 239, 121 L.Ed.2d 173 (1992).[2] Furthermore, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). Where, as here, both parties have urged us to decide whether Sprosty's confession was voluntary, the issue has been fully briefed and argued on the merits, and we have the benefit of the state trial court record of the two suppression hearings in which all of the facts surrounding Sprosty's confession and his other incriminating statements were fully developed, thus obviating any need for an evidentiary hearing before the district court, it is in

---

**2.** *But see Clisby v. Jones,* 960 F.2d 925, 938 (11th Cir.1992) (*en banc*) (in habeas corpus petition raising more than one ground for relief, appellate court will entertain appeal only after all petitioner's claims have been disposed of by district court in the first instance), *cert. denied,* ——

U.S. ——, 115 S.Ct. 1127, 130 L.Ed.2d 1089 (1995); *Stewart v. Bishop,* 403 F.2d 674, 680 (8th Cir.1968) (questioning appellate jurisdiction in cases where district court did not rule on all claims raised by petitioner).

the interest of judicial economy that we address Sprosty's claim.

▇▇▇ The Supreme Court has characterized the voluntariness of a confession as an issue of law for purposes of § 2254(d), and thus subject to plenary review. *See Thompson*, —— U.S. at ——, 116 S.Ct. at 465; *Miller*, 474 U.S. at 110, 116–17, 106 S.Ct. at 452–53. We defer, of course, to the state trial court's factual findings. 28 U.S.C. § 2254(d); *see Thompson*, —— U.S. at ——, 116 S.Ct. at 463. A confession is considered voluntary if the state demonstrates that it "was not secured through psychological or physical intimidation but rather was the product of a rational intellect and free will." *United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir.1994) (quoting *United States v. Haddon*, 927 F.2d 942, 945 (7th Cir.1991)) (internal quotation, citation omitted). Like other misrepresentations, an empty prosecutorial promise could prevent a suspect from making a rational choice "by distorting the alternatives among which the person under interrogation is being asked to choose." *Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir.1989); *see also United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir.1995) (generally, a false promise of leniency to induce confession is a forbidden tactic), *pet. for cert. filed*, No. 955845 (U.S. Sept. 5, 1995); *United States v. Rutledge*, 900 F.2d 1127, 1129–30 (7th Cir.) (same), cert. denied, 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990). On the other hand, the state is not prohibited from inducing a confession with an honest promise of leniency. *Rutledge*, 900 F.2d at 1130 (collecting cases). Moreover, in considering whether an empty prosecutorial promise deprived the suspect of his ability to make a rational choice, we take into account the characteristics of the suspect as well as the nature of the interrogation. *See Montgomery*, 14 F.3d at 1194. The age of the suspect, his lack of education or experience, whether he was advised of his constitutional rights, the length of time he was detained, whether he was subjected to prolonged interrogation, and whether police used physical punishment or deprived him of food or sleep are all factors to be considered in making this determination. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Lord v. Duckworth*, 29 F.3d 1216, 1222 (7th Cir.1994); *Montgomery*, 14 F.3d at 1194–95.

▇▇ Sprosty argues that, because he confessed as a result of Valley's promise to have burglary charges against him dropped at a time when there were no such charges pending, his confession was rendered involuntary by improper police inducement. At the close of the second evidentiary hearing, the state court determined that Sprosty's confession was in fact motivated by Valley's promise as Sprosty had claimed, but that the promise was fulfilled. (Feb. 7, 1991 Tr. at 38–39.) The court made this determination after hearing the testimony of James A. Fabian, the county prosecutor of Houston County, Minnesota, who stated that, as of the date of the search, he did not intend to charge Sprosty with burglary in his county, in part because it appeared that their case was weak, and in part because a charge of receiving stolen goods would probably be more easily proved in the jurisdiction where the stolen items were found. Fabian further testified that he agreed to allow Wisconsin authorities to inform Sprosty that he would not be facing burglary charges in Minnesota if that would aid them in obtaining evidence in their case. Fabian also expressly agreed to forego any future possibility of ever prosecuting Sprosty on the burglary charges.

Sprosty's argument focuses on the discrepancy between Valley's statement that the burglary charges would be dropped, and Fabian's testimony that his office did not intend to bring charges. Sprosty claims that the misinformation he received from Valley thus rendered his confession involuntary. We do not believe that the difference between the deal that was offered by Valley and the deal that was kept by Fabian is significant enough to have impeded Sprosty from making a rational choice in deciding to lead Valley to the photographs and to confess to his crimes. *See Rutledge*, 900 F.2d at 1130–31 (noting that the police are not the fiduciaries of the suspect). At the time Valley made the offer, Sprosty was twenty-five years of age, had already had some experience with the criminal justice system, and presumably

knew what acts he had committed in Minnesota that could support burglary charges there. *See Fare v. Michael C.*, 442 U.S. 707, 726–27, 99 S.Ct. 2560, 2572–73, 61 L.Ed.2d 197 (1979); *Lord*, 29 F.3d at 1222; *Rutledge*, 900 F.2d at 1130. The record also reveals that Sprosty thought about the offer for approximately twenty minutes before deciding to reveal where the photographs were hidden, and that Sprosty was not subjected to coercive questioning or physical deprivation during that time. Sprosty was, moreover, advised of his *Miranda* rights both at the beginning of the search of his mobile home, and again after he was brought to the police station for further interrogation. In both instances, Sprosty acknowledged that he understood his rights, and he formally waived them prior to signing the confession. *See Fare*, 442 U.S. at 726–27, 99 S.Ct. at 2572–73; *Lord*, 29 F.3d at 1222. And although no burglary charges were pending in Minnesota at the time of Valley's offer, as a direct result of the offer Sprosty was able to secure a firm promise from Minnesota officials that no charges would ever be brought. Sprosty thus received some benefit from the bargain. As in *Rutledge*, the police did not magnify or exploit Sprosty's fears, anxieties and uncertainties to the point where he was unable to make a rational decision about whether to confess. *See Rutledge*, 900 F.2d at 1130–31. We therefore conclude that his confession was voluntary.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's decision granting Sprosty's petition for writ of habeas corpus, and REMAND with directions to dismiss the petition.