# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00325-CR

**Matthew Allen Harris, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 59543, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Matthew Allen Harris of the offense of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2007). Punishment was assessed at life imprisonment. In a single issue on appeal, Harris challenges the district court's denial of his motion to suppress statements he made to law enforcement officers. We will affirm the judgment.

## BACKGROUND

We will discuss the facts of this case to the extent they are relevant to our disposition of Harris's appeal.[1] The statements that Harris sought to suppress were obtained by law enforcement

---

[1] A more complete discussion of the underlying facts may be found in this Court's opinions affirming the convictions of two of Harris's three co-defendants. *See Alligood v. State*, No. 03-06-00516-CR, 2007 Tex. App. LEXIS 5473 (Tex. App.—Austin July 12, 2007, no pet. ) (mem. op., not designated for publication); *Hammock v. State*, No. 03-06-00523-CR, 2007 Tex. App. LEXIS 5474 (Tex. App.—Austin July 11, 2007, pet. ref'd) (mem. op., not designated for publication). As of the date of this opinion, the appeal of a third co-defendant, Eric Siperko, remains pending.

officers during their investigation into the murder of Jason Gonzalez in June 2005. The murder allegedly happened during a robbery of Gonzalez's home. One of the suspects in the crime was Russell Alligood. Police obtained a statement from Alligood in which he admitted being involved in the murder and named three other participants: Brandon Hammock, Eric Siperko, and a person whom Alligood knew only as "Romeo." Officers suspected that "Romeo" was a nickname belonging to Harris.

On June 16, 2005, Detectives Gary Hall and Ed Peck of the Harker Heights Police Department drove to Harris's residence to verify that Harris was "Romeo." Detective Hall testified that they were in plain clothes and traveling in an unmarked police vehicle. When they arrived, they knocked on the door, and Harris answered. When the detectives asked Harris if he was "Romeo," Harris responded that he was. Hall then asked Harris if he could step outside and speak to him. Hall testified that Harris agreed. Hall also testified that he did not make Harris any promises or threaten him in any way to get him to talk or come out of his house. As they walked outside, Hall asked Harris, "You tell me what happened on Iron Jacket?"[2]

Detective Hall explained that after he asked this question, Harris was "[r]ather gushing with information" about what happened. According to Hall, Harris told him that he, Alligood, Hammock, and Siperko had kicked in the door to Gonzalez's house. Harris and Alligood then entered the house from one side while Hammock and Siperko entered it from the other side. Harris told Hall that he heard someone yell, "Get down, get down," and then heard a gunshot. The

---

[2] Iron Jacket was the name of the street on which the victim lived.

2

four then left the house, but Harris and Alligood returned to take Gonzalez's truck. When Hall asked Harris where the truck was now located, Harris told him, "Out there in the lake." Hall then asked Harris, "Mr. Harris, you have a lot of information, valuable information. I'd like to get that from you. If you would please, I'd like to use you for a witness. Would you come down to the police department so I can get this on videotape?"

At trial, the State asked Detective Hall the following questions about his encounter with Harris at his house:

Q:    Did you arrest him?

A:    No, sir.

Q:    Did you place him in custody?

A:    No, sir.

Q:    Did you tell him he would be arrested or placed in custody?

A:    No.

. . . .

Q:    Did you place Matthew Harris in the back of your car or did he ride with you down to the Harker Heights police station?

A:    He drove his own vehicle.

Q:    Did he follow you there?

A:    No, sir.

Q:    So you went straight from the house . . . down to the Harker Heights Police Department?

A:    Correct.

3

Q:      How long were you at the Harker Heights Police Department before Matthew Harris showed up?

A:      I believe approximately 30 minutes, if not longer.

When asked what happened when Harris arrived at the police department, Hall testified, "He showed up and we went in and took him right into the interview room where it was already set up, sat him down and I handed him a *Miranda* form.[3]  He initialed it, signed one of them.  And then we went into the conversation from there."  Harris also signed and initialed a "voluntary appearance form."  According to Hall, at this time, Harris was not in custody.  When asked if he thought at this point that Harris "was a witness or he was more involved than that and could be a suspect," Hall testified, "More involved, could be a suspect."  However, Hall did not know exactly what offense Harris could be charged with, only that what Harris had told him at the house was enough to get him charged with "something."

On cross-examination, Detective Hall testified that, during the interview at the police department, Harris asked Hall if he was "going to give him any rope to hang [himself]."  Hall told Harris, "Like I told you out there at the house, I'd like to use you for a witness."  Harris then asked, "just a witness?"  Hall responded, "just a witness."  Defense counsel then asked Hall, "Now, if he's just a witness, why did you have him sign off on *Miranda* warnings?"  Hall answered that his lieutenant told him to do so "just prior" to the interview.

Detective Hall testified that, at the conclusion of the videotaped interview, he had probable cause to arrest Harris.  However, he told Harris that he was free to leave.  Hall then spoke

---

[3]  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

with his supervisor, Detective Charles Gee, who informed Hall that he was supposed to have obtained a written statement from Harris prior to releasing him.

Detective Gee and Detective Peck then went to Harris's place of employment to ask Harris to return to the police station and provide a written statement. Gee testified, "And I introduced myself to Mr. Harris and I told him, 'I'm Detective Gee with the Harker Heights Police Department, I need you—I would like for you to come up and give a voluntary statement of what transpired on your video statement.'" Gee further testified:

> Q:     Did you tell him that you preferred that it be in writing?
>
> A:     Yes, I said, "We need to get it in writing, tie up the loose ends."
>
> Q:     And what was his response?
>
> A:     He said, "Well"—he said, he would. He said he would when he had a chance to get off of work.
>
>        I said, "Okay, that's fine."
>
>        I said, "It's a voluntary statement. You'll be able to leave and come back."

Approximately two to three hours later, Harris returned to the police station, again in his own vehicle. Detective Gee met Harris in the lobby and took him to his office. Gee then asked Lieutentant Loretta Fox, the department's administrative division lieutenant, to come into the office and type out Harris's statement. Lieutenant Fox testified that Harris basically just dictated the statement to her while she typed it. Occasionally, Fox explained, when Harris got "too general" in his statement and used the word "we," Fox "would ask who 'we' were and he would tell [her]." Gee testified that as Harris was dictating the statement to Fox, he went in and out of his office,

5

working on other things. At one point, Gee recounted, "I believe I even offered him a coke." After the statement was completed, Fox printed it out and handed it to Gee. Gee testified that he "went over the statement with Mr. Harris word for word," and then "had him initial the left and right of each page, beginning and end of each page." Harris also signed the last page of the statement. Next, Gee explained, Harris gave his consent for the police to search his vehicle. During the search, Harris gave Gee a radar detector that Harris believed was stolen property. After that, Gee testified, "I thanked him very much for his cooperation and he left. He was free to go."

The next day, Detective Hall obtained arrest warrants for all four suspects. Harris was subsequently arrested and charged with capital murder.

Prior to trial, Harris sought to suppress the oral statement he made to Detective Hall at the house, the videotaped statement he made during his interview at the police station, and the written statement he dictated to Lieutenant Fox. In his motion to suppress, Harris contended that the statements he made were obtained after law enforcement officers led him to believe that he was only a witness and not a suspect in the crime. Therefore, according to Harris, his statements were not "freely and voluntarily made without compulsion or persuasion." *See* Tex. Code Crim. Proc. Ann. art. 38.21 (West 2005).

The district court denied Harris's motion to suppress. On the record, the district court recited its findings of fact and conclusions of law, including that Harris was not in custody at the time he made his statements, that he voluntarily went to the police department prior to giving both his videotaped statement and his written statement, that his statements were voluntarily made, and that his statements were not the product of custodial interrogation.

6

The statements were admitted into evidence at trial, and Harris was subsequently convicted of capital murder. This appeal followed.

## STANDARD OF REVIEW

A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). In other words, the trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory. *Id*. The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give trial courts almost complete deference in determining historical facts, but we review de novo the trial court's application of the law. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

## ANALYSIS

At the hearing on his motion to suppress, Harris argued that his statements should be suppressed pursuant to article 38.21 of the code of criminal procedure. Under article 38.21, "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion[.]" Tex. Code Crim. Proc. Ann. art. 38.21. A statement may be deemed "involuntary" under three different theories: (1) failure to comply with article 38.22 of the code of criminal procedure (the Texas confession statute); (2) failure to comply with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966); or (3) failure to comply with due process or due course of law because the statement was not freely given (e.g. coercion, improper

7

influences, incompetency). *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996); *Moore v. State*, 233 S.W.3d 32, 44 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In this case, Harris asserts that his statements were obtained in violation of due process because (1) they were obtained through "deception," and (2) they "were not properly Mirandized."

**Custody**

We will first address the issue of compliance with *Miranda*. Police officers are not required to administer *Miranda* warnings to everyone whom they question, nor is this requirement of warnings to be imposed simply because the questioning takes place in the police station. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda* warnings are only required where there has been a restriction on a person's freedom as to render him in "custody." *Id*.

"A person is in custody if, under the totality of the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996); *Houston v. State*, 185 S.W.3d 917, 920 (Tex. App.—Austin 2006, pet. ref'd). "The 'reasonable person' test presupposes an *innocent* person." *Florida v. Bostick*, 501 U.S. 429, 438 (1991) (emphasis in original); *Dowthitt*, 931 S.W.2d at 254. Moreover, the initial determination of custody depends on the objective circumstances of the interrogation, not the subjective views of the police or the person being questioned. *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 254; *Houston*, 185 S.W.3d at 920. The subjective views of the police regarding custody may be relevant as a circumstance of the interrogation if they are conveyed to the individual being questioned, but only to the extent that the communication of those views would affect

8

a reasonable person's understanding of his freedom of action. *See Stansbury*, 511 U.S. at 325; *Dowthitt*, 931 S.W.2d at 254; *Houston*, 185 S.W.3d at 920.

As a general rule, when a person voluntarily accompanies law enforcement to a certain location, even though he knows or should know that law enforcement suspects that he may have committed or may be implicated in committing a crime, that person is not restrained or "in custody." *Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987); *Miller v. State*, 196 S.W.3d 256, 264 (Tex. App.—Fort Worth 2006, pet. ref'd). More specifically, so long as the circumstances show that a person is acting only upon the invitation, request, or even urging of law enforcement, and there are no threats, either express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not in custody. *Anderson v. State*, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996); *Miller*, 196 S.W.3d at 264. However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Ussery v. State*, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983); *Miller*, 196 S.W.3d at 264.

Texas courts have recognized at least four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 255; *Trejos v. State*, 243 S.W.3d 30, 44 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). "Concerning

9

the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect; such manifestation could occur if information substantiating probable cause is related by the officers to the suspect *or by the suspect to the officers*." *Trejos*, 243 S.W.3d at 44 (emphasis added).

Here, Harris contends that the fourth situation was implicated. He argues that as soon as he began telling Detective Hall about his involvement in Gonzalez's murder, Hall had probable cause to arrest him.[4] At that point, Harris contends, he was in custody.

We agree with Harris that the record supports a finding that Hall had probable cause to arrest Harris as soon as Harris explained his involvement in the murder. In fact, Hall acknowledged in his testimony that he had probable cause to arrest Harris at least as early as when Harris completed his videotaped interview at the police department. And, Hall testified, even before Harris arrived at the police department, Hall knew that what Harris had told him at the house was enough to get Harris charged with "something." However, even if Hall's knowledge of probable cause was "manifested" to Harris, s*ee Dowthitt*, 931 S.W.2d at 257 (holding that officer's knowledge of probable cause was manifested to suspect when suspect admitted to officer "that he was present during the murders . . . and a reasonable person would have realized the incriminating nature of the admission."), it would not, without more, establish custody. Custody is established "if the

_____

[4] As support for this argument, Harris relies on *Ruth v. State*, 645 S.W.2d 432 (Tex. Crim. App. 1979), in which the court of criminal appeals held, "The appellant's statement that he had shot the victim immediately focused the investigation on him and furnished probable cause to believe that he had committed an offense. After that time, the continued interrogation must be considered a custodial one." 645 S.W.2d at 436. We note, however, that *Ruth* was decided before *Dowthitt v. State*, 931 S.W.2d 244 (Tex. Crim. App. 1996), in which the court of criminal appeals held that "custody is established if the manifestation of probable cause, *combined with other circumstances*, would lead a reasonable person to believe that he is under restraint *to the degree associated with an arrest*." 931 S.W.2d at 255 (emphases added).

10

manifestation of probable cause, *combined with other circumstances*, would lead a reasonable person to believe that he is under restraint *to the degree associated with an arrest*." *Dowthitt*, 931 S.W.2d at 255 (emphases added). In *Dowthitt*, for example, these other circumstances included a lengthy interrogation lasting over 12 hours from the time the suspect first appeared at the police station to the time he made the incriminating statement, police officers accompanying the suspect to the restroom, and police officers ignoring the suspect's requests to see his wife. *Id*. at 257.

The record supports an implied finding by the district court that such circumstances were not present in this case. At the house, Harris explained to Detective Hall his involvement in the crime. Harris did so, Hall testified, without Hall making any threats or promises. In fact, according to Hall, Harris was "rather gushing with information" about what happened. Hall then told Harris, "Mr. Harris, you have a lot of information, valuable information. I'd like to get that from you. If you would please, I'd like to use you for a witness. Would you come down to the police department so I can get this on videotape?" Harris agreed. There is no indication in the record that Detectives Hall and Peck engaged in conduct at Harris's house that would "cause a consensual inquiry to escalate into custodial interrogation." *See Ussery*, 651 S.W.2d at 770. To the contrary, Hall testified that he did not make any promises or threats to Harris during the encounter at the house.

After Harris agreed to go to the police department, the officers left the house and went to the police department unaccompanied by Harris. Harris traveled to the police department separately in his own vehicle and arrived approximately 30 minutes after the officers arrived. Upon his arrival, Harris was taken to an interview room. He signed a "voluntary appearance form" which

provided, "I am here of my own free will and under no coercion from any peace officer, person, or other agency. I further understand that I am not under arrest or detention and I may stop any interview and voluntarily leave these premises at any time." The record also reflects that Harris read, initialed, and signed written *Miranda* warnings.[5] There is no indication in the record of any conduct by Detective Hall or any other officer before, during, or after the interview that would "cause a consensual inquiry to escalate into custodial interrogation." *See id*. After the interview was complete, Detective Hall told Harris that he was free to leave.

Then, when Harris was later asked to return to the police department to provide a written statement, Harris told Detective Gee that he would come in after he got off from work. Detective Gee told Harris, "Okay, that's fine." Gee added, "It's a voluntary statement. You'll be able to leave and come back." Again, Harris drove himself to the police department. Once there, he was taken to Gee's office, where Harris dictated his statement to Lieutenant Fox, who was the only officer present in the room the entire time. Gee was "in and out" of the office and even offered, at one point, to get Harris "a coke." There is no indication in the record that either Fox or Gee engaged in any conduct before, during, or after the dictation of Harris's statement that would "cause

---

[5] We note that the reading of *Miranda* warnings does not automatically transform a non-custodial setting into a custodial interrogation. *See United States v. Bautista*, 145 F.3d 1140, 1148 (10th Cir. 1998); *Sprosty v. Buchler*, 79 F.3d 635, 642 (7th Cir. 1996); *Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) (to hold that *Miranda* warnings create custody "would convert admirable precautionary measures on the part of officers into an investigatory obstruction"). However, the giving of *Miranda* warnings is a factor in the determination of whether a reasonable person would believe that he is in custody. *See Bautista*, 145 F.3d at 1148; *Sprosty*, 79 F.3d at 642. The record in this case supports an implied finding by the district court that this one factor suggesting custody was outweighed by the other factors suggesting that Harris was not in custody, including the statement in the "voluntary appearance form" that Harris was "not under arrest or detention and I may stop any interview and voluntarily leave these premises at any time."

12

a consensual inquiry to escalate into custodial interrogation." *See id*. After Harris finished dictating his statement, he was again told that he was free to leave.

On numerous occasions, circumstances similar to the above have been held to not constitute custody. *See, e.g.*, *California v. Beheler*, 463 U.S. 1121, 1124-25 (1983) (finding no custody when suspect voluntarily accompanied police to station, talked for less than 30 minutes, and was permitted to return home); *Mathiason*, 429 U.S. at 495 (same); *Meek v. State*, 790 S.W.2d 618, 622 (Tex. Crim. App. 1990) (finding no custody when suspect came to station voluntarily at time of his own choosing, was allowed to step outside building and go unaccompanied to his car during interviews, and "a few hours" later was allowed to leave unhindered after statements were completed); *Dancy v. State*, 728 S.W.2d 772, 777-79 (Tex. Crim. App. 1987) (finding no custody when suspect voluntarily came with police to station, voluntarily answered questions, gave hair samples, allowed police to take his shoes to run print comparisons, and was arrested at conclusion of 38-minute interview); *Turner v. State*, 685 S.W.2d 38, 41-43 (Tex. Crim. App. 1985) (finding no custody when witness who was not suspect was contacted by police, voluntarily went to police station to make statement, and was immediately read warnings when he made statement that caused police to suspect him); *Trejos*, 243 S.W.3d at 46-47 (finding no custody when suspect "rode with a police officer to the station" and "was only interviewed by one police officer, who was in plain clothes, and in an office-like setting."); *Houston*, 185 S.W.3d at 921 (finding no custody when suspect voluntarily came to police station and "the detectives specifically told [the suspect] that he was not under arrest and implied through their questioning that he could leave."); *Garcia v. State*, 106 S.W.3d 854, 858-59 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (finding no custody when

13

suspect "voluntarily went to the police department, and after he was told that he could leave, he voluntarily gave a videotaped statement."); *White v. State*, 931 S.W.2d 736, 742 (Tex. App.—Corpus Christi 1996, pet. ref'd) (finding no custody when suspect voluntarily came to police department on multiple occasions, gave multiple statements, and was told he was free to leave after each statement).

There are no facts present here that distinguish this case from the above cases. We conclude that the record supports the district court's finding that Harris was not in custody when he provided his statements to the police. Therefore, the requirements of *Miranda* were not implicated.

**Deception**

Even in the absence of custody, due process may be violated by admitting confessions that are not voluntarily given. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996); *Martinez v. State*, 131 S.W.3d 22, 24 (Tex. App.—San Antonio 2003, no pet.). A statement is not voluntary if there was "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); *Martinez*, 131 S.W.3d at 24-25. Harris contends that his statements were not voluntarily given because Detective Hall deceived him into believing that he was only a witness to the crime and not a suspect.

The issue here is not whether Detective Hall was deceptive (as the State conceded at the suppression hearing that he was), but whether this deception rendered Harris's statements involuntary. This Court has previously held, "Voluntariness is not destroyed, and a confession induced by deception or trickery is not inadmissible, unless the method used was calculated to

14

produce an untruthful confession or was offensive to due process." *Dotsey v. State*, 630 S.W.2d 343, 349 (Tex. App.—Austin 1982, no pet.).

The deception of which Harris complains was the statement by Detective Hall on two occasions (at Harris's house and during the interview at the police department) that he would like to use Harris "as a witness" when, in fact, Hall believed that Harris "could be a suspect" and, as we explained earlier, had probable cause to arrest Harris as soon as Harris first explained the nature of his involvement in the murder. However, there is nothing in the record to indicate that this particular deception was "calculated to produce an untruthful confession or was offensive to due process." Rather, Hall's deception is similar to police conduct that other courts have found to not violate due process. *See, e.g.*, *Green v. State*, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996) (finding that misrepresentation by police "that there was an eyewitness to the murder" did not render confession involuntary because statement "directly relate[d] to appellant's guilt"); *Snow v. State*, 721 S.W.2d 943, 946 (Tex. App.—Houston [1st Dist.] 1986, no pet.) (finding that statement by police officer that suspect "was being interviewed only as a witness" did not violate due process); *see also Frazier v. Cupp*, 394 U.S. 731, 737-39 (1969) (refusing to find that defendant who confessed, after being falsely told that his codefendant has turned State's evidence, did so involuntarily); *Holland v. McGinnis*, 963 F.2d 1044, 1051-52 (7th Cir. 1992) ("Of the numerous varieties of police trickery, however, a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary"); *but see Lynumn v. Illinois*, 372 U.S. 528, 533-34 (1963) (holding confession involuntary when police distorted suspect's rational choice by deceiving her into believing "that state financial aid for her infant children would be cut off, and her children taken

from her, if she did not 'cooperate.'").  We conclude that the record supports the district court's finding that Harris's statements to the police were voluntarily made.

The district court did not abuse its discretion in denying Harris's motion to suppress. We overrule Harris's sole issue on appeal.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   July 11, 2008

Do Not Publish

16