UNITED STATES of America,
Plaintiff–Appellee,

v.

Deborah B. BURNS, a/k/a Mary Jennings,
Defendant–Appellant.

No. 93–3445.

United States Court of Appeals,
Seventh Circuit.

Argued May 13, 1994.

Decided Sept. 27, 1994.

Steven M. Biskupic, Asst. U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

David R. Saggio, Gerardo J. Hernandez (argued), Gonzalez & Saggio, Milwaukee, WI, for defendant-appellant.

Before CUDAHY, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

Deborah B. Burns was arrested after law enforcement officers discovered a kilogram of cocaine in her hotel room. Burns was charged in a two count indictment with possession of cocaine with intent to distribute and with crossing state lines for unlawful purposes. The original two-count indictment was superseded by a three-count indictment, which added a charge of conspiracy to distribute cocaine. Burns was convicted on all three counts.

While Burns' appeal was pending, she filed a motion with the district court pursuant to Rule 33 of the Federal Rules of Criminal Procedure, requesting a new trial based on newly discovered evidence. Specifically, Burns indicated that she had recently learned that one of the prosecution's material witnesses had perjured himself at her trial. The district court granted Burns' motion for a new trial. A second jury trial was held, and Burns was again convicted of all three counts charged in the indictment. She was sentenced to 121 months imprisonment on the possession count, to 121 months imprisonment on the conspiracy count, and to 60 months imprisonment on the crossing state lines count. All of the sentences run concurrently. Burns now appeals.

## I. Background

Deborah Burns was part of a drug distribution ring run by Marcos Cojab, a Miami cocaine supplier. Cojab regularly sent kilogram and half-kilogram quantities of cocaine to Wisconsin using several couriers, including Burns. Two undercover DEA agents agreed to purchase five kilograms of cocaine from Rayborn Hendrix, the head of the ring's Wisconsin drug operations. Hendrix and the DEA agents agreed to exchange one kilogram of cocaine, as a test, prior to consummating the larger deal. That kilogram was brought to Milwaukee by Burns.

The evidence admitted during the "suppression hearing"[1] showed that Burns, using the name Mary Jennings, paid cash for a $338 one-way airline ticket from Miami to Milwaukee. She arrived in Milwaukee and, again using the name Mary Jennings, checked into room 227 of a Holiday Inn hotel located near the airport. The DEA subsequently put Burns' hotel room under surveillance. The following day, Burns opened her hotel room door with a room service tray in her hand. DEA agent Jerome Snyder, who had been observing room 227 from nearby, approached Burns, identified himself, and asked her what her name was. She told him that her name was Katherine. Snyder asked Burns what her last name was and she responded that she did not know. Snyder then informed her that he had a search warrant for the room.

Snyder, Burns, and Kenny Kujawa of the Milwaukee County Sheriff's Department

---

1. This hearing actually occurred during the second day of Burns' first trial, out of the presence of the jury.

went into the room. Snyder told Burns to sit on the bed. During execution of the search warrant, Snyder began to empty the contents of Burns' suitcase. At the same time, he asked her what she was doing in Milwaukee. She responded that she was visiting friends. Snyder then asked Burns who her friends were; she responded that she had no friends in Milwaukee. Approximately three minutes into the search, the law enforcement officers found a kilogram of cocaine in a dresser drawer, wrapped in a hotel towel. Burns responded to the discovery by stating, "that [sic] not mine, I don't know what it is." A total of three or four minutes elapsed between the time Snyder approached Burns in the hallway outside her room and the time she stated that the cocaine was not hers.

During execution of the search warrant, Burns asked to leave the hotel room a number of times. Snyder told her that she had to stay on the bed until the search was completed. Burns was not read *Miranda* warnings prior to her formal arrest.

At the beginning of the second day of her first trial, Burns sought to suppress the statements she made during execution of the search warrant. She argued that the statements should be suppressed because she had not been read *Miranda* warnings before Snyder began questioning her. The district court denied the motion. First, the court found that the motion was untimely. Second, the court concluded that *Miranda* warnings were not required because Burns was not under arrest at the time the questioning took place. Prior to her second trial, Burns renewed the motion to suppress her incriminating statements. The government responded by filing a motion requesting the district court to expand on its earlier announced legal basis for denying the motion to suppress.

The district court subsequently issued a written opinion denying the renewed motion to suppress. *United States v. Burns,* 811 F.Supp. 408 (E.D.Wis.1993). The court initially found that Burns' detention, pursuant to the search warrant, was a reasonable "seizure" under the Fourth Amendment. *Id.* at 412. Addressing the Fifth Amendment issue, the court noted that " '*Miranda*' warn-

ings are to be given only to suspects who are subjected to 'custodial interrogation.' " *Id.* at 413 (citation omitted). According to the court, Burns "was not subjected to a degree of restraint associated with that of a formal arrest." *Id.* Thus, she was not in "custody" and no *Miranda* warnings were required. In the alternative, the court concluded that even if Burns was in custody, "Snyder's inquires would not have constituted interrogation." *Id.* The court stated that "Snyder's questions plainly concerned only defendant's identity and residence, and thus are analogous to routine inquiries asked during booking." *Id.*

At her second trial, the government introduced the following incriminating statements: (1) Burns' statement to Snyder that her first name was Katherine and that she did not know what her last name was, (2) her statement that she was in Milwaukee visiting friends and her subsequent statement that she had no friends in Milwaukee, and (3) her statement, made when the cocaine was discovered, that she did not know what the cocaine was and that it was not hers.

## II.   Analysis

We review the district court's denial of a motion to suppress for clear error. *United States v. McCarthur,* 6 F.3d 1270, 1275 (7th Cir.1993). Because questions arising under the Fourth and Fifth Amendments are primarily factual, "we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Id.* (citations omitted).

### A.   Fourth Amendment

The Fourth Amendment protects citizens against "unreasonable searches and seizures." As a general matter, both searches and seizures must be conducted pursuant to a warrant or based on probable cause. *See Skinner v. Railway Lab. Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989). However, as we will discuss later, the Supreme Court has developed several exceptions to the warrant and probable cause requirements. Under the Exclusionary Rule, physical evidence ob-

tained during an unlawful search and incriminating statements resulting from an unlawful seizure may not be introduced against a defendant in the prosecution's case-in-chief. *See Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

■ In this case, there can be no question that the search of Burns' hotel room was proper. It was conducted pursuant to a valid search warrant issued by a federal magistrate. It is also beyond doubt that Burns was "seized" during execution of the search warrant. A reasonable person in Burns' situation would not have felt free to leave. *See McCarthur*, 6 F.3d at 1275 (" '[A] person has been "seized" within the meaning of the Fourth Amendment . . . only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' ") (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988)). Moreover, Burns was not detained pursuant to an arrest warrant. Nor does the government contend that the law enforcement officers had probable cause to detain her prior to discovering the cocaine. Thus, we are left to determine whether Burns' detention fits into one of the several exceptions to the probable cause requirement.

■ In *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court held that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. at 2595 (footnotes omitted). In that case, police officers were about to execute a search warrant when they encountered the owner of the house coming down the front steps. Once the police had gained admittance to the house, they brought the owner into the house and detained him during execution of the search warrant. During the search, the police found narcotics in the basement and subsequently placed the owner under formal arrest.

At issue was whether the pre-arrest "seizure" was reasonable under the Fourth Amendment. Relying on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (permitting a police officer to conduct a patdown search for weapons and briefly question a citizen based on less than probable cause), *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (allowing an officer to forcibly stop a suspect to investigate an informant's tip indicating that the suspect was armed and carrying narcotics even though the informant's tip did not give the officer probable cause to make an arrest), and *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (approving brief stops of vehicles near the U.S. border with Mexico to question occupants of the vehicles about their citizenship, without probable cause to search or arrest), the Court concluded that the seizure was reasonable. According to the Court:

> These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. . . . They are consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause. But they demonstrate that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams*.

*Summers*, 452 U.S. at 699–700, 101 S.Ct. at 2592–93 (footnotes omitted). The Court upheld the constitutionality of the pre-arrest seizure based on several factors. The Court noted that the search warrant had been issued by a "neutral and detached magistrate" who had probable cause to believe that the law was being violated in the house. *Id.* at 701, 101 S.Ct. at 2593. According to the Court, detention of the owner, while a "significant restraint on his liberty, was surely less intrusive than the search itself." *Id.*

(footnote omitted). The Court reasoned that because the detention took place in the owner's residence, "it could only add minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702, 101 S.Ct. at 2594. Consequently, the Court concluded that the detention was " 'substantially less intrusive' than an arrest." *Id.* (quoting *Dunaway v. New York,* 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979)).

Based on *Michigan v. Summers,* we likewise conclude that Burns' detention for less than ten minutes while the search warrant was being executed was "substantially less intrusive than an arrest" and was therefore a reasonable seizure under the Fourth Amendment.

## B. *Miranda* Warnings

■ Burns contends that the statements she made to Agent Snyder should have been suppressed because she was not read *Miranda* warnings prior to the statements. In order to protect a citizen's right against self-incrimination guaranteed by the Fifth Amendment, the Supreme Court held in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that suspects must be read certain warnings [2] before they are subjected to "custodial interrogation." *Id.* at 444, 86 S.Ct. at 1612. A suspect must be both "in custody" and subject to "interrogation" to trigger the *Miranda* warnings requirement. As a threshold matter, therefore, we must determine whether Burns was in custody during execution of the search warrant. A person is in custody for purposes of *Miranda* if that person is either formally arrested or has suffered a " 'restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason,* 429

U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)).

■ In determining whether a suspect is in custody, courts look at "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). This determination is based on the "totality of the circumstances." *United States v. Fazio,* 914 F.2d 950, 954 (7th Cir.1990). " 'The accused's freedom to leave the scene and the purpose, place and length of interrogation are all relevant factors in making this determination.' " *United States v. Hocking,* 860 F.2d 769, 773 (7th Cir.1988) (quoting *United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir.1985)).

■ In considering whether a suspect is in custody for purposes of *Miranda,* courts have often consulted the line of Fourth Amendment cases, beginning with *Terry v. Ohio,* discussing whether certain seizures are "reasonable" absent probable cause. For instance, in *Berkemer,* the Supreme Court addressed the issue of "whether the road-side questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.' " *Berkemer,* 468 U.S. at 435, 104 S.Ct. at 3147–48. In deciding the issue, the Court analogized to its seminal Fourth Amendment *Terry* decision:

[T]he usual traffic stop is more analogous to a so-called *"Terry* stop," see *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain the person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). "[T]he stop and inquiry must be 'reasonably related in scope to the justifi-

---

**2.** The now familiar *Miranda* warnings require that the defendant be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that

if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630.

cation for their initiation.'" *Ibid.* (quoting *Terry v. Ohio, supra,* 392 U.S., at 29, 88 S.Ct., at 1884). Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.* The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda.*

*Id.* 468 U.S. at 439–40, 104 S.Ct. at 3150 (footnotes omitted). Relying on *Berkemer,* this court has held that *Miranda* warnings are not required where a suspect has been detained pursuant to a *Terry* investigatory stop. *See United States v. Boden,* 854 F.2d 983, 995 (7th Cir.1988).

While detention during the execution of a search warrant is not a traditional *Terry* stop, it is sufficiently analogous for us to conclude that, in the usual case,[3] *Miranda* warnings are not required. The Supreme Court specifically held in *Michigan v. Summers* that such detentions are "substantially less intrusive than an arrest." *Summers,* 452 U.S. at 702, 101 S.Ct. at 2594. In other words, a suspect who is detained during the execution of a search warrant has not suffered a " 'restraint on freedom of movement' of the degree associated with a formal arrest," and is thus not "in custody" for purposes of *Miranda. Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520 (citation omitted).

Most detentions that occur during the execution of a search warrant, like most *Terry* stops, are "comparatively nonthreatening."

They are often short in duration. Moreover, such detentions are "surely less intrusive than the search itself." *Summers,* 452 U.S. at 701, 101 S.Ct. at 2593. Furthermore, detention in a person's own residence or hotel room "could only add minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702, 101 S.Ct. at 2594. Therefore, we conclude that, in the usual case, a person detained during the execution of a search warrant is not "in custody" for purposes of *Miranda.*

██. Moreover, the specific facts of this case do not suggest a contrary result. Burns was detained for less than ten minutes prior to her arrest. She was not handcuffed or physically restrained in any way until she was formally placed under arrest. Only two law enforcement officers conducted the search, and they did not brandish weapons. Finally, the officer's questioning was limited in scope and duration.[4] Burns was thus not in custody for purposes of *Miranda.* Accordingly, the district court did not err in refusing to suppress Burns' incriminating statements.

We have carefully considered the five other arguments that Burns raises on appeal and now reject them as being totally without merit.

### III. Conclusion

For all of the forgoing reasons, we AFFIRM Deborah Burns' conviction and sentence.

CUDAHY, Circuit Judge, with whom ILANA DIAMOND ROVNER, Circuit Judge, joins, concurring.

Although I find the majority's analysis and disposition of the *Miranda* point to be persuasive on these particular facts, I think we need not decide it. The answers to the questions asked during the search are of

---

**3.** As the Supreme Court recognized in *Summers,* "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, ... however, no such special circumstances or prolonged detention occurred here." 452 U.S. at 705 n. 21, 101 S.Ct. at 2595–96 n. 21.

**4.** Because we conclude that Burns was not in custody for purposes of *Miranda,* we need not decide whether she was subjected to interrogation.

minimal evidentiary weight compared to the kilogram of cocaine found in the motel room. The questioning during the search, whether right or wrong, was certainly harmless. I would affirm on that basis.