UNITED STATES of America,
Plaintiff,

v.

Russell FREEMAN, Defendant.

No. CRIM.A.03–111–KAJ.

United States District Court,
D. Delaware.

July 14, 2004.

Colm F. Connolly, Esquire, United States Attorney; Anne Park, Esquire, Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware; Counsel for Plaintiff.

Mark S. Greenberg, Esquire; Philadelphia, Pennsylvania; Counsel for Defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. Introduction

Before me is a motion to suppress (D.I. 13; the "Motion") filed by the Defendant, Russell Freeman, Jr. The Motion challenges the sufficiency of the warrant on which the search of the Defendant's residence was based and evidence was seized. (*Id.* at ¶¶ 1–2, 4.) It also challenges the good faith of the law enforcement officers' reliance on the warrant (*id.* at ¶ 5) and the interrogation of the Defendant at the time of the search (*id.* at ¶ 3). As to the first two issues, the sufficiency of the warrant and the good faith reliance of the officers, the parties agree that these are issues of law to be resolved on the face of the warrant and supporting affidavit. (*See* D.I. 19 at ¶ 3; Tr. at 2–3.)[1] An evidentiary hearing was held with respect to the last issue, focusing specifically on whether the Defendant was in custody at the time he was interrogated and made certain incriminating statements. For the reasons that follow, I hold that the Defendant was in custody and that the statements he made must therefore be suppressed. Nevertheless, because I also hold that the warrant was based on an affidavit that sufficiently set forth probable cause for the search, and because I further hold that the physical evidence seized at the residence would inevitably have been found during the search, regardless of the Defendant's incriminating statements, that physical evidence will not be suppressed.

### II. Background

At 6:00 a.m. on Thursday, July 24, 2003, several members[2] the Delaware State Police Special Operations Response Team, which is a tactical SWAT-type of team known by its acronym "SORT" (Tr. at 5), descended on the Defendant's residence at 364 Marldale Drive in Middletown, Delaware. (*Id.* at 4–5.) They were there to secure the premises prior to the execution of a search warrant issued by a Delaware justice of the peace. (*See* D.I.19 at Ex. A; Tr. at 6–7.) The warrant was based on a twenty-five paragraph affidavit sworn to by Corporal Robert Jones of the Delaware State Police and Nicole Schafer a Probation and Parole Officer employed by the Delaware Department of Correction. (D.I. 19 at Ex. A.) The affidavit notes that four confidential informants provided mutually corroborating information implicating the Defendant as a wholesale distributor of illegal drugs in Delaware. (*See id.* at ¶¶ 3–7.)

Among other things, the affidavit stated that the first confidential informant has provided reliable information in the past to law enforcement officers and that the past information led to significant arrests and seizures of unlawful drugs. (*Id.* at ¶ 3.) In June of 2003, that informant identified the Defendant by name, stated that the Defendant lived in Middletown, Delaware, carried a firearm, stored currency and the firearm at his home, maintained a separate apartment as a stash house for the preparation and distribution of cocaine, and frequently used rental vehicles and an Acura SUV in his dealings. (*Id.*)

---

1. References to "Tr. at [page number]" are to the transcript of the May 24, 2004 evidentiary hearing in this matter.

2. The government's witness, Delaware State Police Corporal Robert Jones, identified the number as "six or seven" who went inside

(Tr. at 6) and some additional number who remained outside. (*Id.* at 20–21.) He acknowledged that the report of the SORT Team leader identified a twelve member SORT Team as participating in the operation at the Defendant's home on July 24, 2003. (*Id.* at 19–20.)

The second informant provided information in July of 2003. The informant identified the Defendant by name, stated that he lived in Middletown, that he stored currency and a firearm in his home, and that he used other locations for the preparation of cocaine for distribution. (*Id.* at ¶ 4.)

The third informant provided information in June and July of 2003. The informant was identified as having provided reliable information in the past that led to multiple arrests, the seizure of large amounts of unlawful drugs, as well as currency and firearms. The informant confirmed the identity of the Defendant by name, that the Defendant lived in Middletown, that he was involved in the wholesale distribution of unlawful drugs, that he used an apartment as a stash house for part of his activities, and that he regularly used rental cars in his illegal activities. (*Id.* at ¶ 5.)

The fourth informant provided information in July of 2003 and was also identified as a past, proven reliable source. The informant confirmed the Defendant's involvement in the wholesale distribution of unlawful drugs in Delaware, the Defendant's use of an apartment as a stash house, and his use of rental cars in his illegal activities. (*Id.* at ¶¶ 6–7.)

Following up on the information received from these informants, drug investigators who are part of a special task force known as the "Governor's Task Force" ("GTF") reviewed motor vehicle records and discovered the Defendant's home address in Middletown and information regarding five vehicles registered to the Defendant at that address. (*See id.* at ¶¶ 8, 11.) They also reviewed criminal history records that revealed the Defendant has an extensive criminal background, including multiple convictions for involvement in the distribution of unlawful drugs. (*See id.* at ¶¶ 9–10.) Members of the GTF then began a surveillance of the Defendant's Middletown residence. (*See id.* at ¶¶ 12–15.) Among other things, they observed the Defendant using a rental vehicle, despite his having at his residence several of his own cars, which they also observed were operational. (*See id.*)

In addition to including the foregoing information in the affidavit submitted in support of the warrant, the affiants also described why, from their own training and experience, they believed that evidence of firearms and drug law violations would be found in the Defendant's residence. (*See id.* at ¶¶ 18–24.) Among those reasons were that drug traffickers often keep firearms in connection with their business, that they also keep drugs, currency, and records associated with their business at their home or in their stash houses or in both. (*See id.*)

Based on the affidavit, a justice of the peace issued the warrant in question on July 22, 2003, authorizing the search of the Defendant's residence on a finding of probable cause to believe that "unlawful drugs, drug paraphernalia, U.S. Currency, deadly weapons including firearms, ammunition, papers, records, items leading to the identification of additional storage locations . . . used or intended to be used for [illegal purposes] . . . ." (D.I. 19 at Ex. A.)

On morning of July 23, 2004, members of the GTF, including Corporal Jones, waited outside the Defendant's residence while the SORT Team secured the premises.[3] (*See id.* at 6–8.) The SORT Team, outfitted in full tactical gear, including black jump suits, helmets, goggles, and weapons, entered the home by breaking in the front door with a battering ram or

---

**3.** SORT teams are used to assist with the execution of warrants involving "high-risk individuals," i.e., "[a]nybody that has a previous history of violence or there's any information that there's going to be weapons at the residence . . . ." (*Id.* at 6.)

some similar instrument. (*Id.* at 7, 21.) In less than ten minutes, the leader of the SORT Team advised the members of the GTF that the premises were secured and that the search could begin. (*See id.* at 8.) Corporal Jones and the five other members of the GTF Team who were there to effect the search then entered the home at approximately 6:10 a.m. (*Id.* at 8–9.) The adult members of the Defendant's family who were present, namely the Defendant, his wife, and his eighteen-year-old son, were restrained in handcuffs with their hands behind their backs.[4] (*Id.* at 9–10, 25.) Corporal Jones testified that it is "standard policy" to restrain adult occupants of a residence during a search of the premises, "just for officer safety reasons." (*Id.* at 10.)

Whether standard or not, the Defendant, having just been rousted by members of a tactical assault team, was handcuffed and placed in his living room to await the arrival of other police officers. (*See id.* at 9–12.) Corporal Jones then came to the Defendant and took him separately to the front porch. (*Id.* at 12.) Corporal Jones introduced himself, and explained to the Defendant that the police had a warrant to search the premises, and that they were looking for "illegal narcotics, firearms, drug paraphernalia, and any other material that related to that." (*Id.* at 12.) Without giving *Miranda* warnings,[5] Corporal Jones then asked the Defendant "if he knew where any of those materials were located, so we don't tear apart the house, using our phrase, he should, you know, tell us where the stuff is now." (*Id.* at 13.) The Defendant then made incriminating statements, directing the officers to a hand gun on a nightstand in the master bedroom, acknowledging that the gun was his,[6] and describing an apartment he kept in his son's name and used as a stash house. (*See id.* at 13–15.) Corporal Jones's conversation with the Defendant lasted approximately ten minutes, after which the officer returned the Defendant to the living room where his family and he remained under the watch of another officer. (*Id.* at 15.) Regardless of his wishes, the Defendant was not free to leave. (*Id.* at 25.)

The police in fact found the hand gun where the Defendant said it was, on the nightstand. (*Id.* at 16.) In the nightstand, they found some white powder which they placed in an envelope and which tested positive for the presence of cocaine. (*Id.* at 17.) About two feet away,

---

4. Corporal Jones was definite in his recollection that the Defendant and the eighteen-year-old son were cuffed but was less certain about the Defendant's wife being cuffed. (*See* Tr. at 10.) He did say, however, that it was standard practice to restrain adults in circumstances like this (*id.*), so I conclude that she was handcuffed.

5. The now familiar statement of rights against self-incrimination and to the assistance of counsel and warnings regarding the consequences of waiving those rights stem from the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. The Defendant initially balked at answering whether the gun was his or not but, when Corporal Jones threatened to arrest the Defendant's wife, the Defendant acknowledged that it was his. (Tr. at 14.) As to the timing of this statement in relation to when the Defendant was placed in custody, Corporal Jones testified that the Defendant was not arrested until after the search was complete and the police were prepared to leave the premises. (*Id.* at 18.) However, the arrest warrant for the Defendant sworn to later that day by Corporal Jones states, "Defendant made a statement when he was arrested that the firearm belonged to him." (*Id.* at 27–28; Defendant's Hearing Ex. 1.) Corporal Jones stated that his use of the words "when he was arrested" as an identification of when the Defendant acknowledged ownership of the gun was "probably just a poor choice of words[.]" (*Id.* at 28.)

they discovered a pair of shorts containing identification for the Defendant and $4,170 in United States currency. (*Id.*) At approximately 7:45 a.m., the police wrapped up their search activities, released the other members of the family, and formally took the Defendant into custody. (*Id.* at 17–18.)

III. *Discussion*

A. *Sufficiency of Warrant*

The Defendant seeks suppression of all of the evidence against him acquired on the day of the search on the theory that the warrant itself was defective and, therefore, the series of events attendant to the execution of the warrant involves the fruits of an illegal search. (*See* D.I. 13.) Accordingly, I first look at the sufficiency of the warrant.

> [A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [for a search warrant] should not take the form of *de novo* review." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Rather, a "determination of probable cause should be paid great deference by reviewing courts." *United States v. Williams,* 3 F.3d 69, 72 (3d Cir.1993). I am "constrained to determine only whether the affidavit provides a sufficient basis for the decision the magistrate judge actually made." *United States v. Whitner,* 219 F.3d 289, 296 (3d Cir.2000) (quoting *United States v. Jones,* 994 F.2d 1051, 1057 (3d Cir. 1993)).

*United States v. Stevens,* Cr. A. No. 03–75–KAJ, 2004 WL 758347 at *1 (D.Del. Apr.6, 2004).

▪ The affidavit submitted for the warrant amply supports the probable cause determination made by the justice of the peace. Four confidential informants, at least three of whom had proven reliable in the past, gave mutually reinforcing information over the course of approximately two months incriminating the Defendant as a significant drug trafficker. (D.I. 19 at Ex. A, ¶¶ 3–7) Three of them identified the Defendant in part by where he lived. (*See id.* at ¶¶ 3–5.) The affiants further tied the probable cause determination to the Defendant's residence by observing his coming and going to that location in a rental car, despite his owning and having on site other cars that they observed to be operational. As the affiants observed, the Defendant's use of rental vehicles had been identified as part of his drug dealing enterprise. (*Id.* at ¶¶ 5,7.) It is also consistent with the known behavior of experienced drug traffickers. *See United States v. Hodge,* 246 F.3d 301, 306 (3d Cir.2001) (use of a rental car is "common practice in the drug trade, indicat[ing] that the anticipated transaction was not an isolated deal, but part of a larger business") (citation omitted).

All of the foregoing was more than sufficient to establish probable cause to believe that evidence of the alleged crimes would be found in the Defendant's home. This is particularly true given the Third Circuit's counsel that,

> direct evidence linking the place to be searched to the crime is not required for the issuance of a search warrant. Instead, probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime. A court is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.

*Id.* at 305–06 (internal quotations and citations omitted). Under the circumstances in this case, the stated facts demonstrate that the Defendant "was an experienced and repeat drug dealer who would need to

store evidence of his illicit activities somewhere," *id.* at 306, and that it was "reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that dealing at his home," *id.* (citation omitted).

### B. Custodial Interrogation

That conclusion, however, does not answer the question of the propriety of the police interrogation of the Defendant in the absence of *Miranda* warnings. It is fundamental that statements made without the benefit of such warning are "inadmissible as evidence if they were the product of 'custodial interrogation.'" *United States v. Leese,* 176 F.3d 740, 743 (3d Cir.1999). There is no dispute that the Defendant here was interrogated. The only question is whether he was in custody at the time of the interrogation.[7] The Defendant argues that, regardless of when the police decided to formally declare him to be under arrest, he was in fact in custody at the time Corporal Jones interrogated him because of the circumstances surrounding the interrogation. (D.I. 22 at ¶¶ 10–11.) I agree.

The Supreme Court has recently reiterated the test from *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), which requires a reviewing court to "consider the circumstances surrounding the interrogation and then determine whether a reasonable person would have felt at liberty to leave." *Yarborough v. Alvarado,* —— U.S. ——, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004). More precisely, the *Thompson* test is framed in two parts:

first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was

not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Id.* Here the circumstances, which are basically undisputed, involve an armed tactical assault team of up to twelve police officers breaking down the Defendant's door at 6:00 a.m., rounding up the residents of the house, handcuffing the Defendant and other adult family members, and putting the Defendant and the other residents under police observation in the living room while first the tactical team and then another half-dozen police officers search the residence. (*Supra* at 465–66.) In addition, the Defendant was isolated from the other family members while Corporal Jones questioned him, and the questioning, while it may have been generally polite in tone, included an explicit threat to arrest not just the Defendant but his spouse as well. (*Supra* at 466 n. 6.) Finally, though it is obvious from these circumstances, the government's witness, Corporal Jones, admitted that the Defendant indeed was not free to leave. (*Supra.* at 466.)

■ There were thus sufficiently significant restraints on the Defendant to equate the circumstances with those of a formal arrest. Indeed, but for the uttering of the words "you are under arrest," I can think of no way to distinguish what occurred that morning from a formal arrest, and I conclude that a reasonable person in the Defendant's position would certainly have understood himself to be in police custody as he was led through his broken-in front door to be questioned in handcuffs while

---

**7.** As the government put it in its post-hearing submission, "[t]he only issue before the Court is whether the defendant was in custody within the meaning of *Miranda* at the time he was questioned by Corporal Robert Jones ...." (D.I. 25 at 7.)

numerous armed police officers surrounded and searched his home in a process that lasted between an hour and a half and two hours.[8] *Cf. Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("The warning mandated by *Miranda* was meant to preserve the privilege during 'incommunicado interrogation of individuals in a police-dominated atmosphere.' ").

Citing *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the government argues that because the interrogation here took place in the context of the execution of a search warrant, the Defendant was not in custody but was merely detained in a manner akin to a *Terry* stop.[9] (*See* D.I. 25 at 7–9.) While detention incident to a search warrant is typically a reasonable seizure under the Fourth Amendment, in part because it is "substantially less intrusive than an arrest[,]" *see Summers*, 452 U.S. at 702, 101 S.Ct. 2587 (internal quotation marks and citation omitted), in this case the restraints upon the Defendant were at least as intrusive as a formal arrest. More to the point, however, the reasonableness of detaining the Defendant during the search is not at issue. I have no doubt that the Delaware State Police were conscientiously endeavoring to secure the safety of all concerned while they were going about their respon-

sibility to search the premises. What is at issue is whether the police can be permitted to extract information from a suspect without giving him *Miranda* warnings when, as is the case here, the circumstances are such that a reasonable person in the Defendant's position would have considered himself to be in custody. The answer to that question is clearly "no." The *Michigan v. Summers* decision itself makes that plain by anticipating and distinguishing cases involving the type of questioning challenged here. The Court said, "the type of detention imposed ... [during the execution of a search warrant] is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." 452 U.S. at 701, 101 S.Ct. 2587. Regardless of the officer's motive, he in fact did exploit the circumstances in this case to obtain information from the Defendant, without first reading the Defendant his rights. That result cannot be permitted to stand. Consequently, the motion to suppress the Defendant's statements will be granted.

### C. Inevitable Discovery

The inadmissibility of the Defendant's statements does not mean that the physi-

---

8. Both parties spent time discussing the Seventh Circuit's opinion in *United States v. Burns*, 37 F.3d 276 (7th Cir.1994), in which the court concluded that the questioning of the defendant while being detained during the search of her hotel was not a custodial interrogation. Suffice it to say that the circumstances in that case appear to me to be clearly distinguishable. The defendant was detained for less than ten minutes, *id.* at 280, was apparently not handcuffed, *see id.* at 277–78, and was asked who she was and why she was in town, questions which the district court had characterized as "analogous to routine inquiries asked during booking." *Id.* at 278. The court noted that usually the detention

associated with the execution of a search warrant is "non-threatening" and is "short in duration," as it was in that case. *Id.* at 281. But that is a far cry from the tactical assault and nearly two hour search and detention involved here.

9. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court "recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 698, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

cal evidence seized at his home that morning is inadmissible. The only piece of physical evidence as to which the Defendant advances any argument for suppression is the firearm. (*See* D.I. 17 at 2–3.) While he argues that it is the fruit of the illegal questioning and must therefore be suppressed (D.I. 22 at 7), "[c]ourts have developed a number of exceptions to the exclusionary rule, including the independent source, inevitable discovery, and attenuation doctrines . . . ." *United States v. Pelullo,* 173 F.3d 131, 136 (3d Cir.1999) (citation omitted). In this case, because a preponderance of the evidence shows that the gun would ultimately or inevitably have been discovered during the course of the lawful search, "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

■ The gun was sitting on a nightstand in the bedroom. (Tr. at 16.) Although it was covered by a hat (*id.*), one can be certain that the police did not dispatch up to eighteen well-trained and specially selected officers [10] to be foiled by a hat. They would certainly have found the gun and, given all of the circumstances, including its being found within two feet of his personal identification (*see id.* at 17), would have seized it for use as evidence in this case. *See United States v. Kirk,* 111 F.3d 390, 392–93 (5th Cir.1997) (gun discovered by officer during an allegedly unlawful search was properly admitted in evidence because other officers, having commenced a proper inventory search, would inevitably have discovered it); *United States. v. Lockett,* 2004 WL 73726, *4

(E.D.Pa.2004) (contraband, including gun, would have inevitably been discovered in defendant's luggage during a lawful inventory search, so even if consent to search luggage had been revoked, gun was admissible under the inevitable discovery doctrine); *cf. United States v. Meade,* 110 F.3d 190, 198 n. 12 (1st Cir.1997) (even if arrest of defendant had been initiated by law enforcement agent lacking probable cause, it is apparent that an agent who did have knowledge constituting probable cause arrived on scene and would have imminently and lawfully discovered and arrested defendant). Consequently, the physical evidence seized from the home, including the gun, will not be suppressed.[11]

## IV. *Conclusion*

For the reasons set forth, the Defendant's Motion to Suppress will be granted to the extent that the statements he made to Corporal Jones will be suppressed, but the Motion will be denied in all other respects. An appropriate Order will follow.

## *ORDER*

For the reasons set forth in the Memorandum Opinion in this case today,

IT IS HEREBY ORDERED that the Defendant's Motion to Suppress (Docket Item 13) is GRANTED in part, to the extent that the statements Defendant made to Corporal Jones while being interrogated at his home on the morning of July 24, 2003 are suppressed and may not be used in evidence against the Defendant

---

10. Eighteen is the sum of the twelve member SORT Team and the six member GTF Team that participated in the search of the Defendant's home that day. (*See* Tr. at 8–9, 19–20.)

11. Because I conclude that the gun is admissible under the inevitable discovery rule, I need not address the government's argument that it should not be suppressed because the Defendant's statements were voluntary (*see* D.I. 25 at 15–16).

in the trial of this case. The Motion is DENIED in all other respects.