## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 24 2018, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Andrew J. Baldwin
Franklin, Indiana

Michael J. Kyle
Franklin, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Plaintiff,*

v.

Ernesto B. Ruiz,

*Appellee-Defendant.*

July 24, 2018

Court of Appeals Case No.
36A01-1712-CR-2999

Appeal from the Jackson Circuit Court

The Honorable Richard W. Poynter, Judge

Trial Court Cause No.
36C01-1510-F4-25

**Altice, Judge**

# Case Summary

The State appeals after the trial court granted Ernesto Ruiz's motion to suppress evidence supporting his charge of Level 4 felony child molesting. The sole issue the State raises is whether the trial court erred in granting the motion to suppress.

We reverse and remand for further proceedings.

# Facts & Procedural History

Ruiz was not born in the United States. At the time this case commenced, he had been in the United States for approximately sixteen years, was married, and had a daughter, M.R.

According to the probable cause affidavit, on Thursday, October 1, 2015, M.R.'s nine-year-old friend M.L. spent the night at M.R.'s house after the two attended a local festival. M.R. fell asleep on the couch in the living room, and M.L. went to sleep in M.R.'s bedroom.

Ruiz returned home from work at around 5:30 a.m. on Friday morning. He entered the bedroom where M.L. was sleeping and asked M.L. for a hug. M.L. obliged.

Approximately twenty minutes later, M.L., unable to return to sleep, went to the living room to see if M.R. was awake. M.L. then walked into the kitchen. Soon after, Ruiz entered the kitchen and again hugged M.L. This time, however, Ruiz took hold of M.L.'s hand and placed it inside of his shorts onto

the bare skin of his buttocks. M.L. attempted to pull away but Ruiz told her, "No, [n]o, [i]t's fine." *Appellant's Appendix Vol. 2* at 18. He then placed her hand back on his buttocks. M.L. pulled her hand into the shirt sleeve of her pajamas, but Ruiz grabbed her hand and moved it in a circular motion on his buttocks while making an "aaahhh" noise. *Id.* Ruiz then placed his hands on M.L.'s buttocks, over her clothes, squeezed, and said, "Yeah." *Id.* M.R. awoke, and Ruiz left the kitchen and went to bed. M.L. told M.R. about the incident, but M.R. told her not to tell anyone. M.L. eventually told one of her teachers about the incident.

[7] On October 7, 2015, Detective Sergeant Greg O'Brien of the Seymour Police Department went to Ruiz's home, advised him of the child molesting allegations, told Ruiz that he "needed to interview him" at the police station, and then left. *Transcript Vol. 1* at 202. Ruiz travelled to the police station on his own and entered the station's unlocked, exterior door that led to a lobby. Detective O'Brien met Ruiz in the lobby and escorted him through a secure door that led to the administration area of the station. Individuals entering this door had to be "buzzed in"; however, there was no impediment to exiting this door. *Id.* at 212. The detective led Ruiz upstairs to an interview room that had one door and no windows. Ruiz was seated in the room near the door, and the door was closed.

[8] The interview began with Detective O'Brien advising Ruiz as follows: "All right. And do you understand that you don't have to talk to me? Do you understand that? You don't have to talk to me. . . . And you understand that

you can get up and walk out that door at any time." *Id.* at 215. Ruiz acknowledged that he understood. When asked, Ruiz told the detective that he spoke Spanish and English and that he "[p]retty much" was fluent in English. *Id.* Ruiz was not provided *Miranda* warnings.

[9] Detective O'Brien asked Ruiz general questions about his work, his wife, and his daughter. He then asked Ruiz specific questions about what he was doing on Thursday, October 1, and what transpired with M.L. on the morning of Friday, October 2. Ruiz initially denied that he hugged M.L.

[10] Approximately thirteen minutes into the interview with Detective O'Brien, Detective Sergeant Troy Munson entered the interview room and introduced himself. He was wearing plain clothes and did not have his firearm. O'Brien and Munson had prearranged that Munson would join the interview. O'Brien continued to question Ruiz, and Ruiz eventually told the detectives that while he was in the kitchen, M.L. "hugged [him], maybe, yeah." *Id.* at 231.

[11] Detective Munson then began to question Ruiz. He did not repeat Detective O'Brien's statements that Ruiz did not have to talk to him or that Ruiz was free to leave the interview room at any time. Detective Munson told Ruiz (falsely), "Just tell us [what happened], but don't lie to us because we've already talked to this girl, [sic] she's already had a lie detector done.[1] Okay? She passed the lie detector test, so we know she's not lying to us . . . ." *Id.* at 242. Ruiz

---

[1] M.L. had not taken a polygraph test.

reiterated that the hug with M.L. occurred in the kitchen and added that, during the hug, M.L.'s hand might have slid down and touched his buttocks. At one point during the interview, Detective Munson told Ruiz:

> Now, we're going to, we're going to take a break here. Okay? For just a minute. We're going to, we let you sit in here and, and think about some of the stuff we said, but what I want you to realize, Ernesto, is we're not here as your enemies, we're here as the truth. Okay? This isn't like the crime of the century, what she's claiming that had happened, it's not a big deal. But what makes you look bad is if you start to lie about things that we already know to be the truth and we know a lot more things than you think that we know because we, because you're the last that we're interviewing here. Okay? So, I just want you to have the opportunity right now to tell us if there was anything that we've already discussed that you know to not be true and you were just scared to tell us about it, but it's not that big of a deal. Tell us now so that we know that you're being honest with us and you're not, you're not lying. Is there anything that you know that you have told us that is not the truth? Just be honest with us. We don't think you're a bad guy or anything.

*Transcript Vol. 2* at 7. Ruiz told Detective Munson that another hug between him and M.L. had occurred.

[12] The detectives left the interview room. When they returned, Detective Munson said to Ruiz: "The results of this, of this investigation so far, okay, clearly indicates [sic] to us, to Officer O'Brien and myself that something, some kind of touching did occur between you and, and [M.L.]. . . . And, and it was of an inappropriate nature . . . ." *Id.* at 11. The detectives continued to interview Ruiz. The entire interview lasted less than one hour. Ruiz was not restrained

during the interview. At the conclusion of the interview, Ruiz left the police station on his own.

[13] Ruiz was charged with Level 4 felony child molesting on October 16, 2015. On December 3, 2017, Ruiz filed a motion to suppress his statements to the detectives. His jury trial began on December 5, 2017. After the jury was sworn, the trial court conducted a suppression hearing and took the matter under advisement. On December 6, 2017, the trial court granted the motion to suppress, stating:

> This is a police setting, this is a secure facility. Yes, [Ruiz] voluntarily went there. But he had to be buzzed into the area or taken into the area of a secure room, the door is shut. Detective O'Brien's [sic] present. He is told, "You can walk out the door," but again, this is where we get into words. This is what concerns me. It's one thing to say, "I can walk out the door." I think most of us here in America that are from here get the context that I'm free to leave. But someone who is not originally from here, this is what caused me concern is that you've got to be very specific they understand that it means basically you're free to leave. That's where I was really tossing with this issue last night. You know, I don't believe the officers in this case did anything inappropriate as far as ill will, but the issue is objective testing. Would a reasonable person under the circumstances believe they are free to go? And what also causes me concern here is when the second officer comes into the room and shuts the door and introduces himself, again, would a reasonable person in this situation, without being told that "You're free to leave," feel free to leave, and especially when the questioning becomes very focused. And that's what one of the case law cases talks about is basically one of the factors to consider is has the police, have the police focused their investigation solely on this person and communicated that fact to the Defendant. It's not just what you

in your heart as an officer know that you're focused on this person, but you have in fact have communicated that fact to the Defendant. There's no doubt in this situation that the Defendant was told that basically, "We believe you did it. We know you did it. We've got proof you did it," you know, "She took a lie detector test. She passed it," you know, "Why would she tell us this?" I mean, it's clearly [sic] the police communicated to the Defendant that he was the focus of the investigation. . . .

If the State is going to use multiple officers to interrogate someone it has to be clear that just because the second officer goes into the room or a third or a fourth, that the situation hasn't changed. But when you have a Defendant who is not originally from this country, who is in a room with [a] shut door with two (2) officers present, I believe at this point a reasonable person would not believe they are free to leave. And therefore, I believe <u>Miranda</u> was required.

*Id.* at 43-44.

[14]     The trial court declared a mistrial "giv[en] the lateness of the Motion to Suppress." *Appellant's Appendix Vol. 2* at 13. The State noted that without the suppressed evidence, it could not proceed on the charge. The trial court issued its written order granting the motion to suppress on December 13, 2017. The State now appeals pursuant to Ind. Code § 35-38-4-2(5).[2] Additional facts will be provided as necessary.

---

[2] This statute addresses appeals by the State and provides, in relevant part, that the State is permitted to appeal from "an order granting a motion to suppress evidence, if the ultimate effect of the order is to preclude further prosecution." I.C. § 35-38-4-2(5).

# Discussion & Decision

The State argues that the trial court erred when it granted Ruiz's motion to suppress his statements to the detectives. When reviewing a trial court's ruling on a motion to suppress, we must determine whether substantial evidence of probative value supports the trial court's decision. *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006). Where a trial court has granted a motion to suppress, the State appeals from a negative judgment and must show that the trial court's grant of the motion was contrary to law. *State v. Carlson*, 762 N.E.2d 121, 125 (Ind. Ct. App. 2002). We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. *Id.* We will not reweigh the evidence or judge witnesses' credibility, and we will consider only the evidence most favorable to the trial court's ruling. *Id.*

## Miranda Rights

A person must be informed of the rights to remain silent and to have an attorney and that what he says may be used against him any time "law enforcement officers question a person who has been 'taken into custody or otherwise deprived of his freedom of action in any significant way.'"[3] *Luna v.*

---

[3] "[A] defendant is entitled to the procedural safeguards of *Miranda* only if subject to custodial *interrogation*." *Lawson v. State*, 803 N.E.2d 237, 239 (Ind. Ct. App. 2004) (emphasis added), *trans. denied*. "'Interrogation' is defined as 'express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect.'" *Id*. (quoting *White v. State*, 772 N.E.2d 408, 412 (Ind. 2002)). The State appears to concede that the detectives' questions constituted "interrogation."

*State*, 788 N.E.2d 832, 833 (Ind. 2003) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)). Statements given in violation of *Miranda* are normally inadmissible in a criminal trial. *Morris v. State*, 871 N.E.2d 1011, 1016 (Ind. Ct. App. 2007), *trans. denied*. "*Miranda* warnings do not need to be given when the person questioned has not been placed in custody." *Johansen v. State*, 499 N.E.2d 1128, 1130 (Ind. 1986). In determining whether a person was in custody or deprived of freedom such that *Miranda* warnings are required, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Luna*, 788 N.E.2d at 833 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). We will make this determination "by examining whether a reasonable person in similar circumstances would believe he is not free to leave." *Id.*; *see also King v. State*, 844 N.E.2d 92, 96-97 (Ind. Ct. App. 2005) ("The test is how a reasonable person in the suspect's shoes would understand the situation."). We will examine all the circumstances surrounding an interrogation, and are concerned with "objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned." *Gauvin v. State*, 878 N.E.2d 515, 520 (Ind. Ct. App. 2007), *trans. denied*.

> [C]ourts have identified the following factors to be significant in determining whether a person is in custody: whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged

coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene.

*Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996), *cert. denied* (internal citations omitted).

[17] The crucial question before us is whether Ruiz was "in custody" during the interrogation for purposes of *Miranda*. The State asserts that Ruiz was not in custody when he gave his statements, and, thus, not subjected to a custodial interrogation that would require *Miranda warnings*. According to the State, Ruiz was not in custody because he was not restrained in any way and was free to leave the police station at any time.

[18] Ruiz contends that he was in custody at the time of the interrogation because, under the totality of the circumstances, a reasonable person in his situation would believe "there was a restraint of freedom to the degree associated with a formal arrest." *Appellee's Brief* at 12. In support of his contention, he maintains that he was interrogated by two different police detectives; the second detective's demeanor was "more aggressive," and the second detective did not tell Ruiz that he did not have to speak with him; there was no evidence that Ruiz knew the doors he entered at the police station were unlocked; the detectives used "accusatory questioning"; the detectives told Ruiz that all the

evidence pointed to him having committed the crime; and the detectives told Ruiz a lie – that the alleged victim had passed a polygraph test. *Id*.

[19] The facts of this case are quite similar to those in *Luna*, where police asked a molestation suspect to come to the police station to discuss allegations against him. The suspect drove himself to the police station, where he was interviewed in an office, behind closed doors, by two officers. The officers told the suspect that he was free to leave at any time. After about an hour of interrogation, during which the suspect confessed, he was allowed to go home. Our Supreme Court concluded, "a person who goes voluntarily for a police interview, receives assurances that he is not under arrest, and leaves after the interview is complete has not been taken into 'custody' by virtue of an energetic interrogation so as to necessitate *Miranda* warnings." *Luna*, 788 N.E.2d at 834.

[20] In *Luna*, our Supreme Court relied on *Oregon v. Mathiason*, 429 U.S. 492 (1977). In *Mathiason,* police initiated contact with the defendant who agreed to come to the patrol office. Accompanying the officer into a closed room, the defendant was told he was suspected of committing a burglary but was not under arrest. The police interrogated him rather aggressively and told him (falsely) that his fingerprints were found at the scene of the crime. During a half-hour interview, the defendant gave a recorded confession. He left the police station after the interview. The Supreme Court held that Mathiason was not in custody or otherwise deprived of his freedom of action in any significant way. Specifically:

> Such a noncustodial situation is not converted to one in which
> *Miranda* applies simply because a reviewing court concludes that

. . . the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Id.* at 495.

[21]   Here, Ruiz voluntarily travelled to the police station. He was taken to an interview room in the administrative part of the station, and he was seated near the door. At no point was Ruiz restrained. Before the interview began, Detective O'Brien told Ruiz that he did not have to talk to him, and that he could "get up and walk out [the] the door" to the interview room at any time. *Transcript Vol. 1* at 215. When Detective Munson entered the room, he was wearing plain clothes, and he did not have his firearm. The entire interview lasted less than one hour; Ruiz was not arrested during or immediately after the interview; and Ruiz was allowed to leave the police station on his own. Ruiz makes much of the facts that he was a suspect, that he was interviewed by two detectives at the same time, that Detective Munson stated (falsely) that the victim had passed a polygraph test, and that Detective Munson's interview style

might have been "more aggressive" (*Appellee's Brief* at 12); however, these factors do not, under these circumstances, render the interview a custodial interrogation requiring *Miranda* warnings. *See Mathiason*, 429 U.S. at 495-96 (noncustodial situation not converted to one where *Miranda* applies simply because, absent formal arrest or restraint on freedom of movement, questioning took place in a coercive environment, and, officer's false statement about finding defendant's fingerprints at the scene had "nothing to do with whether [defendant] was in custody for purposes of *Miranda*); *see also Luna*, 788 N.E.2d at 834 (requirement of *Miranda* warnings is not to be imposed simply because the questioned person is one whom the police suspect).

[22] We conclude that based on the totality of the circumstances, a reasonable person in circumstances similar to those Ruiz experienced would believe he or she was free to leave. Thus, because Ruiz was not in custody when he was interrogated by the detectives, *Miranda* did not apply. The trial court's grant of Ruiz's motion to suppress his statements to the detectives was contrary to law.

[23] The trial court erred in granting Ruiz's motion to suppress his statements to the detectives. We reverse and remand for further proceedings.

Najam, J. and Robb, J., concur.